RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0272P (6th Cir.)
File Name:  04a0272p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

LIRI NOREK MARKU,
  *Petitioner,*

  *v.*

No. 02-4366

JOHN ASHCROFT, Attorney
General; IMMIGRATION AND
NATURALIZATION SERVICE,
  *Respondents.*

———————

On Appeal from the Board of Immigration Appeals.
No. A73 415 870.

Submitted:  March 12, 2004

Decided and Filed:  August 20, 2004

Before:  MOORE, CLAY, and CUDAHY, Circuit Judges.[*]

———————

**COUNSEL**

**ON BRIEF:**  Ira J. Kurzban, KURZBAN, KURZBAN,
WEINGER & TETZELI, Miami, Florida, for Petitioner. Lyle

———————

[*]The Honorable Richard D. Cudahy, Circuit Judge of the United
States Court of Appeals for the Seventh Circuit, sitting by designation.

D. Jentzer, Linda S. Wernery, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for
Respondents.

———————

**OPINION**

———————

RICHARD D. CUDAHY, Circuit Judge.  In this appeal,
Petitioner Liri Norek Marku seeks review of a Board of
Immigration Appeals (BIA) order denying her application for
asylum and withholding of deportation under sections 208
and 241(b)(3) of the Immigration and Nationality Act (INA),
8 U.S.C. §§ 1158, 1231(b)(3).  Because the BIA properly
found that Marku failed to demonstrate past persecution or the
likelihood of future persecution on account of a political
opinion or membership in a particular social group, we
AFFIRM.

## I.   BACKGROUND

Marku, a citizen of Albania had lived in Fier, Albania, all
of her life, before fleeing to the United States in 1995.  App.
at 86-87.[1]  While in Albania, Marku was the Chief Finance
Officer (also called the top economist) of the government-
owned National Government Tobacco Company of Albania
(NGTCA) from 1975 until 1994.  *Id*. at 59, 108.  In 1994, part
of NGTCA merged with a private Greek tobacco company
known as Costa.  *Id.* at 58, 93.  After the merger, the NGTCA
continued to exist as a separate entity but the newly-formed
joint venture became known as National United Kavax

———————

[1]The appendix annexed to Petitioner's brief in this case will be
designated as "App."

Industry (KAVAX).[2] Technically, after the merger, Marku worked for both KAVAX and the NGTCA. *Id.* at 93. One of her responsibilities was to prepare and file KAVAK's public financial disclosures. *Id.* at 108-09.

KAVAX ended its first fiscal year with a deficit of approximately $280,000.[3] *Id.* at 11, 17, 94. Marku blamed these losses, in part, on Spiro Sota, Marku's direct supervisor, who was in charge of KAVAX and was also a Vice Minister in the Ministry of Agriculture, appointed by the Prime Minister of Albania. *Id.* at 17-18, 113, 116, 128. Albanian law HR 83 requires the dissolution of companies with annual losses exceeding certain thresholds.[4] *Id.* at 94, 103, 118-119. Apparently, if Marku were to file accurate public financial disclosures, correctly reflecting the company's significant losses, KAVAX would have to be dissolved under the Albanian law. *Id.*

---

[2] Marku was unclear in her testimony as to what extent KAVAX was considered a private or public entity. *Compare* App. at 93 (testifying that KAVAX was "governmental but . . . [it] was more or less . . . a company that was privately owned."); *and id.* at 100 ("It was a privately-owned firm that was cooperating with the government."); with *id.* at 113 ("As far as the joint venture Kavax was concerned, the state was in charge."); and *id.* at 130 (describing KAVAX as "public and state owned").

[3] There is discrepancy in the record as to exact amount of the deficit. Marku's affidavit indicates that the deficit was $1,862,532, and her testimony consistently rounds that to $1,800,000. App. at 59, 94, 117, 141. The IJ's opinion, however, indicates that the deficit was $280,000, which is the dollar equivalent of 1,800,000 leke. *Id.* at 11.

[4] Marku's testimony suggests that the Albanian law applies only to private entities or to joint ventures between public and private entities. App. at 118-19 (suggesting that Sota wanted Marku to transfer the loss from KAVAX to the NGTCA because as a wholly public entity, the NGTCA did not have to comply with the law); *id.* at 17 (noting that the state owned company was exempt from dissolution in the event of loss).

Therefore, in January of 1995, Sota called Marku into the director's office and tried to persuade her to manipulate KAVAX's balance sheet in order to disguise the company's losses. *Id.* at 59-60, 117. Specifically, Sota asked Marku to shift the loss from KAVAX to NGTCA. *Id.* at 17, 60, 95, 117. He promised Marku that he would protect her from the law in case the auditors discovered the manipulation. *Id.* at 117. Despite Sota's promise, Marku feared that she would be sent to jail and refused to comply. *Id.* at 95, 117. In response to her refusal, Sota placed a revolver on the desk, presumably as a not-so-veiled threat. *Id.* When Marku again refused to doctor the books, Sota raised his voice, hit his hand on the desk and then placed it on the revolver. *Id.* at 117. The meeting was interrupted by the unannounced arrival of Sota's secretary. *Id.*

A week after the meeting, Sota, giving no advance notice, sent Marku on a business trip with a colleague to the city of Vlore. *Id.* at 12, 60, 117. On their way back, a car drove straight at them, causing their car to veer off the road and flip over three or four times. *Id.* at 60, 118. Both Marku and her colleague suffered injuries. *Id.* Marku's colleague reported the incident to the police, and the police revealed, after an investigation, that the driver who caused the accident was a former chauffeur of Sota. *Id.* at 98, 118, 124. Marku did not know whether the government ever pressed criminal charges against the driver. *Id.* at 124.

Marku testified that she did not report Sota's conduct and threats to anyone because she believed it would be futile, as the entire government was corrupt. *Id.* at 132 ("I had no place to go and complain because corruption was everywhere. . . . I was aware that there was no constitution in place where I could . . . have my own rights protected by law."). Fearing for her life, Marku made an early and accurate submission of the corporate filings report. *Id.* at 13, 61, 120, 123. After obtaining a visa in someone else's name, she immediately fled to the United States, leaving her

daughters behind because she could not get a visa for them.[5] *Id*. at 13, 61, 88, 120, 125. It appears that Marku left without alerting anyone in the government about Sota's attempts at corruption or threats of violence. At some point after she fled the country, Marku's friends back in Albania told her that KAVAX had been dissolved and Sota fired. *Id*. at 13, 61, 142. However, according to these unidentified friends, after a new government came to power in 1997, he was appointed 'Primary Expert' at the Ministry of Finance or the Ministry of Agriculture, a position similar to the one he had previously held. *Id*. at 13, 61, 97, 120-21, 125, 142.[6]

Meanwhile, Marku continues to fear persecution were she to return to Albania. She writes, "It can be eas[ily] understood that many persons, [A]lbanian and Greeks, whose interests were hurt, can not forgive me." *Id*. at 80. She testified that there was extensive corruption in Albania, and that she saw Sota's corrupt activities as part of a general trend. *Id*. at 119-20, 123. However, other than the incidents described *supra*, Marku does not detail any specific instances of corruption. To support her contentions, she cites to a State Department report, which indicates that the judicial system in Albania is inefficient, corrupt, and subject to executive pressure even when the political situation is stable. *Id*. at 32-

33. The State Department report states further that "[a]ccusations of corruption among public officials have been raised during each of the three governments." *Id*. at 33. Marku also cites to an Amnesty International report which mentions that a journalist had been detained after he wrote that "corruption [and] 'degraded politics' might 'explode' in Albania." *Id*. at 71.

Marku arrived in the United States on or about February 28, 1995, filed a timely application for asylum on November 6, 1995, and a renewed application for asylum and withholding of removal on August 13, 1998. Pet. Br. at 3; App. at 50, 73, 81. Marku was issued a Notice to Appear before an Immigration Judge (IJ) on December 11, 1997, and was charged with failure to possess a "valid nonimmigrant visa or border crossing identification card at the time of application for admission." App. at 81. On August 14, 1998, Marku appeared telephonically before an IJ in Detroit. *Id*. at 83. She requested asylum, withholding of removal, or in the alternative, voluntary departure. Pet. Br. at 9. On September 14, 1998 and November 16, 1998, Marku appeared before the IJ to present evidence and testimony in support of her asylum application. Pet. Br. at 9; App. at 85, 102.

In an oral opinion on November 16, 1998, the IJ found Marku credible but concluded:

> [T]here is insufficient evidence to establish that the persecutor imputed any political claim whatsoever to the respondent. Rather, the individual directly responsible for taking action against this respondent did so as a result of his fear that she would expose his criminal and corrupt activities.

App. at 14, 18, 19. Accordingly, the IJ denied Marku's application for asylum and withholding of removal, but did grant her the privilege of voluntary departure. *Id*. at 21. The BIA dismissed the appeal on October 9, 2002, agreeing that there was "no nexus between the harm directed towards the

---

[5] According to the State Department Report upon which she relies, shortly after Marku fled to the United States, the Office of the Interior Ministry established an Internal Affairs Office to deal with citizen complaints and to uncover public corruption. App. at 33. We mention this not because of its potential bearing on the reasonableness of Marku's fear of future prosecution, but so that Marku will be aware of this resource, in the unlikely event that she ever finds herself in a similar situation.

[6] While Marku was in the United States, her sister also informed her that someone had unsuccessfully attempted to kidnap Marku's daughters while they were walking home from school. App. at 68. However, there is no evidence to suggest that this alleged attempt was related to the incidents at KAVAX. In fact, Marku testified that kidnaping of young girls for export was a persistent problem in Albania. *Id*. at 126.

respondent and a protected ground." *Id*. at 2. The BIA found that Sota's attempts to harm Marku were motivated by his fear that she would disclose his illegal activities and not by any of the statutorily protected grounds. *Id*. Marku appeals the BIA's decision, arguing that the BIA erred as a matter of law in holding that she was not persecuted on account of her political opinion or membership in a particular social group.

## II.   DISCUSSION

We must determine whether the BIA erred in holding that Marku is not eligible for asylum because she did not prove she fears persecution on account of a ground protected by the INA. We review the BIA's factual determinations using the substantial evidence standard, in which we uphold a BIA determination as long as it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992). Reversal of a factual determination of the BIA is only warranted when the reviewing court finds that the evidence not only supports a contrary conclusion, but *compels* it. *See Klawitter*, 970 F.2d at 152. We review the BIA's conclusions of law *de novo*. *See Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004); *Amadou v. INS*, 226 F.3d 724, 726 (6th Cir. 2000); *Adhiyappa v. INS*, 58 F.3d 261, 265 (6th Cir. 1995).

An applicant for asylum must demonstrate that she is a refugee as defined by the INA. *See* 8 U.S.C. § 1101(a)(42)(A); 8 U.S.C. § 1158(a); *see also Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994). To establish refugee status, an alien has the burden of proving that she is unable or unwilling to return to her home country "because of persecution or a well-founded fear of persecution *on account of* race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (emphasis added); *see also Koliada v. INS*, 259 F.3d 482, 487 (6th Cir. 2001).

Marku argues that she was and will be persecuted based on her political opinion, which she describes generally as an opposition to government corruption. Similarly, Marku argues that she was and will be persecuted on account of her membership in a "class comprised of former government employees who directly contested government corruption." Reply Br. at 20. It is true that a number of courts have held that opposition to government corruption can constitute a political opinion under particular circumstances. *See, e.g., Li Wu Lin v. INS*, 238 F.3d 239, 244 (3d. Cir. 2001); *Gonahasa v. INS*, 181 F.3d 538, 543 (4th Cir. 1999); *Reyes-Guerrero v. INS*, 192 F.3d 1241, 1245 (9th Cir. 1999); *Marquez v. INS*, 105 F.3d 374, 381 (7th Cir. 1997); *Gonzales-Neyra v. INS*, 133 F.3d 726 (9th Cir. 1997); *In re Desir*, 840 F.2d 723, 727 (9th Cir.1988). Substantial evidence, however, supports the BIA's finding that, in this case, Marku's actions did not constitute an expression of political opinion and that no political opinion was imputed to her.

In order to demonstrate that an applicant has been persecuted on account of a political opinion or membership in a particular social group, it is not enough to present evidence that the applicant *had* a political opinion or *was* a member of that social group. *See* 8 U.S.C. § 1101(a)(42)(A). Evidence must be presented which suggests that the applicant was persecuted *on account of* or *because of* the political opinion. *Id.*; *see also Elias-Zacarias,* 502 U.S. at 479; *Klawitter*, 970 F.2d at 152; *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 349 (5th Cir. 2002); *Ochave v. INS.*, 254 F.3d 859, 862 (9th Cir. 2001); *Zayas-Marini v. INS*, 785 F.2d 801, 805-06 (9th Cir. 1986). In this case, Marku's testimony may suggest that, as an ideological matter, she was opposed to government corruption, but she presents no evidence that any of her actions were ideologically motivated or that Sota, her alleged persecutor, perceived them as such.

To start with, Marku does not claim that she ever publicly opposed corruption.[7]  *Cf. Marquez*, 105 F.3d at 381 (indicating that if the applicant "had spoken out repeatedly as a public gadfly about reforming a corruption-ridden government," this would be more likely to result in a finding of persecution on account of political opinion).  Instead, the only evidence Marku presents (beyond her own testimony) to suggest that she was even opposed in principle to government corruption, is the fact that she refused to doctor KAVAX's books.  No evidence in the record, however, compels the conclusion that Marku's refusal was based on a political opinion.  To the contrary, she testified that her motive for refusing to submit doctored balance sheets was her desire not to go to jail.  App. at 117 ("I couldn't do this personally, because I could be sent to jail."); *see also* App. at 95 ("I couldn't believe [Sota] that he was going to protect me . . . [M]ost likely I was going to wind up in jail.").  Marku never counseled Sota against engaging in corrupt activity, nor did she attempt to directly expose his corruption at any time before or after leaving the country.  Her actions and statements suggest that she simply did not want to be personally involved in criminal activity.[8]  Without more,

---

[7] When asked whether she ever expressed a political opinion, she replied, "Of course, . . . I made my criticism to certain levels of the society when something went wrong, but my words went to the deaf ear . . . ." App. at 137.  Marku, however, never specified to whom she spoke or the nature of her criticism.  Such testimony is not "sufficiently detailed to provide a plausible and coherent account of the basis" for her fear of persecution on account of political opinion.  *Perkovic*, 33 F.3d at 621.

[8] Marku may well fit into the particular social group of "former government employees" or "former government employees who refused to comply with their employer's demands," however, Marku has presented no evidence which compels the conclusion that this makes her particularly likely to be persecuted in Albania.  Therefore, the BIA could not be compelled to find that Marku had a reasonable fear of future persecution on such a basis.

submission of accurate balance sheets, under the facts of this case, is not an expression of political opinion.[9]

Even if Marku had demonstrated that she acted based on a political opinion, she presented no evidence that Sota interpreted her refusal as such.  *See Adhiyappa*, 58 F.3d at 267 ("[T]he motives of the asylum seeker are relevant only to the extent that they illuminate the motives of the alleged persecutors.").  Marku is not expected to provide direct proof of Sota's motive, but must show "*some* evidence of it, direct or circumstantial." *Elias-Zacarias*, 502 U.S. at 483.  Because she is asking this court to reverse the determination of the BIA, the evidence must be "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Id.*

As noted above, Marku presented no evidence that she ever denounced corruption in public or at work.  She presented no evidence that Sota believed her reason for refusing to commit fraud was anything other than her desire not to go to jail.  Therefore, there is no evidence that Sota imputed a political opinion to Marku.  Far from compelling the conclusion that Sota was reacting to any political opinion, Marku's testimony suggests that Sota's motives were also purely personal.  App. at 118 (suggesting that Sota was acting out of fear of losing his job); *see also Klawitter,* 970 F.2d at 152 ("However distasteful his apparent treatment of the respondent may have been, such harm or threats arising from a personal dispute of this nature, even one taking place with an individual in a high governmental position, is not a ground for asylum."); *Tarubac*

---

[9] Although some courts have held that when the government persecutes an individual who has not committed a crime, the persecution is presumably 'on account of political opinion,' *Hernandez-Ortiz v. INS*, 777 F.2d 509, 517 (9th Cir. 1985), the presumption is rebutted when, as here, there is evidence indicating that political opinion was *not* the reason for the persecution.  In any case, it is not clear that it would even make sense to apply this presumption where the "government" is limited to one director of a quasi-public company.

*v. INS*, 182 F.3d 1114, 1999 (9th Cir. 1999) (suggesting that, although largely irrelevant in a mixed motive case, evidence of a nonpolitical motivation is clearly relevant where the BIA finds substantial evidence that the only motivation for the persecution was nonpolitical).[10]

Moreover, given (a) the largely private nature of KAVAX (it was, in part, privately owned and its mission was more commercial than governmental); (b) the fact that the attempted corruption related solely to avoiding financial disclosure obligations; and (c) the fact that the subject misconduct was an attempt to thwart a law which applied only to private entities, it is unlikely that Sota believed he was even asking Marku to be a part of *political* or *governmental* corruption. This makes it even less likely that Sota would interpret Marku's refusal as being *politically* motivated.

Marku relies on three Ninth Circuit cases for the proposition that her actions amounted to an expression of political opinion. *See Reyes-Guerrero*, 192 F.3d at 1245; *Grava v. INS*, 205 F.3d 1177 (9th Cir. 2000); *Desir*, 840 F.2d at 727. Of course, these cases from outside the circuit are not binding on us, but they do have some persuasive value. *See Duffy v. Ford Motor Co.*, 218 F.3d 623, 629 (6th Cir. 2000).

---

[10]Marku argues that the BIA failed to properly apply a mixed motive analysis. It is true that when an asylum applicant demonstrates that she was persecuted on the basis of more than one factor, she is eligible for asylum so long as one of those factors is a protected ground under the INA. *See Girma v. INS*, 283 F.3d 664, 667 (5th Cir. 2002). Here, however, substantial evidence supports the BIA's conclusion that Marku was not persecuted on the basis of *any* protected ground. The BIA stated for explanatory purposes the motive behind Sota's persecution of Marku, *i.e.*, Sota's fear that Marku would expose him. The BIA did not conclude that the presence of this motivation precluded it from finding that Marku was also persecuted on the basis of a protected ground. The BIA merely found no evidence that Marku was persecuted on any protected ground. Therefore, a mixed motive analysis would not be appropriate in this case although it might well be under other circumstances. *See Amanfi v. Ashcroft*, 328 F.3d 719, 727 (3d Cir. 2003).

It is true that in these cases, the court found persecution on account of political opinion because of the petitioners' opposition to corruption. The cases are distinguishable, however, because unlike here, it was clear that the other petitioners were being persecuted *because of* an imputed political opinion.

In each of these cases, the petitioners were on relatively public campaigns against wide-spread corruption. For instance, in *Reyes-Guerrero*, the petitioner was investigating and prosecuting the corruption of 18 members of the Liberal party, on behalf of the opposing political party. *See Reyes-Guerrero*, 192 F.3d at 1243. Other than being in retaliation for this investigation and prosecution, which, on its face, was inherently political, there was no other plausible explanation for the persecution which followed. *See id.* at 1245. The court noted that "[t]he BIA was precisely right that [the petitioner] was 'perceived to be "playing politics" or seeking to embarrass the Liberal Party in his attempt to obtain convictions of the defendants.'" *Id.* at 1245.

Similarly, in *Desir*, the petitioner repeatedly refused to pay an extortionate tax, despite each refusal's resulting in his arrest. *See Desir*, 840 F.2d at 724. In so doing, he "expressly refused to affiliate himself with a particular faction." *Id.* at 729. Further, the petitioner in *Desir*, presented evidence that he regularly met in a small group to discuss his opposition to the government "kleptocracy." *Id.* at 724-25. The court concluded that it "must view [the petitioner] as possessing a political opinion because his persecutors . . . both attributed subversive views to [him] and treated him as a subversive." *Id.* at 729.[11]

---

[11]In *Grava*, the petitioner was a customs agent who repeatedly uncovered and reported corruption in a number of customs offices, despite the fact that every time he blew the whistle, he was transferred to a new office. *See Grava*, 205 F.3d at 1179-80. The court in *Grava* did not find that there was a nexus between the petitioner's persecution and his asserted political opinion. *Id.* at 1181. The court merely found that the

In contrast, here Marku has presented no evidence to compel the conclusion that Sota or anyone else knew or should have known that she was even opposed to government corruption or had any other political opinion.  Because the BIA properly found that Marku did not demonstrate past persecution or the likelihood of future persecution *on account of* a political opinion or membership in the class of government employees who opposed corruption, asylum is not an appropriate remedy.  Therefore, we AFFIRM the decision of the BIA and DENY the petition for review.[12]

---

BIA erred in finding that Grava's whistleblowing could not, as a matter of law, constitute an expression of political opinion.  *Id.*

[12] To qualify for withholding of deportation, an applicant must show a "clear probability of persecution," which is a stricter standard than the "well-founded fear" standard that applies with respect to applications for asylum. *See INS v. Stevic,* 467 U.S. 407, 430 (1984); *see also* 8 C.F.R. § 208.16(b)(1). Because Marku has failed to demonstrate a well-founded fear of persecution on account of a political opinion or membership in a particular social group, her request for withholding of deportation must likewise fail.  *See Ali*, 366 F.3d at 411-12; *Daneshvar v. Ashcroft,* 355 F.3d 615, 625 (6th Cir. 2004).