NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0715n.06
Filed: November 20, 2008

No. 07-3581

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MOHAMED ANTAR, | ) | |
| | ) | ON APPEAL FROM THE |
| *Petitioner-Appellant,* | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| v. | ) | |
| | ) | **O P I N I O N** |
| | ) | |
| MICHAEL MUKASEY, ATTORNEY GENERAL | ) | |
| OF THE UNITED STATES, | ) | |
| | ) | |
| *Respondent-Appellee.* | ) | |
| | ) | |
| | ) | |

**BEFORE: CLAY and COOK, Circuit Judges; and OLIVER, District Judge.** [*]

**SOLOMON OLIVER, JR., District Judge.** Petitioner/Appellant Mohamed Antar

("Antar") appeals the final order of the Board of Immigration Appeals ("BIA"), which affirmed the

Immigration Judge's ("IJ") denial of Antar's application for asylum and the withholding of removal

under 8 U.S.C. §§ 1158(a)(1) and 1231(b)(3), respectively, and for protection under the Convention

Against Torture ("CAT"), 8 C.F.R. §§ 1208.16(c), 1208.18. For the following reasons, the court

AFFIRMS the BIA's order.

**I. BACKGROUND**

**A. Hearing Before the IJ and the IJ's Subsequent Ruling**

---

[*] The Honorable Solomon Oliver, Jr., United States District Judge for the Northern
District of Ohio, sitting by designation.

<u>1. Antar's Testimony</u>

Antar was born on November 4, 1974, in Freetown, Sierra Leone. ( J.A. at 97.) Antar stated that he is not a citizen of Sierra Leone because whites cannot obtain citizenship. (*Id.*) Antar explained that his parents are Lebanese, but he is not a Lebanese citizen because he was not born in that country. (*Id.*) Antar testified that his mother died when he was eight years old. (*Id.*) Antar has three sisters and one brother, all of whom departed from Sierra Leone to the United States in the early 1990s due to the civil war. (*Id.* at 98.) Antar, the youngest child, remained in Sierra Leone with his father. (*Id.*)

Antar testified that, while he and his father were at a mining site, they were captured in 1994 in an attack by Revolutionary United Front ("RUF") rebels. (*Id.*) The rebels wounded and killed some people, and those who were not killed were captured and separated into two groups of young and old individuals. (*Id.*) Antar stated that he was separated from his father at this time and never saw him again. (*Id.*)

Antar testified that he was taken to a rebel camp called Zimi, where he was held against his will, beaten, starved, and sexually abused. (*Id.*) Antar testified that he was used as a human shield by the rebels as they attacked villages, shot and captured villagers, raped women, burned down houses, and stole food. (*Id.*) Antar recounted other atrocities perpetrated by the rebels, including the killings of Antar's aunt and cousin, a village chief, and a female soldier. (*Id.*) Antar testified that he eventually succeeded in escaping from Zimi in 1998, when his captors assigned him to assist with carrying guns and ammunition to Kono. (*Id.*) In Kono, the Nigerian army attacked the rebels, and Antar escaped during the ensuing battle and walked approximately sixteen miles to Koindu, which borders Guinea. (*Id.*)

2

Antar claimed that individuals he met in Koindu provided him with a canoe to cross the river to Faranah, Guinea, where he escaped with only the clothes on his back. (*Id.*) In Faranah, Antar received assistance from Lebanese citizens and escaped to Conakry, Guinea. (*Id.*) While in Conakry, Antar met a Lebanese man named Mohamed Fawase, who knew Antar's brother-in-law's father and helped him contact his brother-in-law in the United States. (*Id.*) With Fawase's help, Antar obtained two Canadian visas and traveled from Conakry to Montreal. (*Id.*) Antar entered Montreal on July 5, 1999, and then went to Toronto and Windsor. (*Id.*) Antar stated that a friend in Windsor, Acram Hamkar, drove him across the Canadian border to Detroit, Michigan. (*Id.*)

Antar submitted an asylum application on May 26, 2000, claiming he was unwilling to return to Sierra Leone because he had no family there and was afraid of RUF rebels that allegedly walk freely throughout the country. (*Id.* at 101.) Antar testified that he has suffered health problems since coming to the United States, including stress, nightmares, inability to sleep, lack of concentration, and difficulty socializing. (*Id.*)

### 2. Testimony of Others on Antar's Behalf

First, Ray Kamoo, Ph.D., a licensed psychologist, testified as an expert witness regarding Antar's psychological health. (*Id.* at 104.) Dr. Kamoo diagnosed Antar with major depression and post-traumatic stress disorder as a result of the trauma he experienced while a prisoner of rebels in Africa. (*Id.*)

Second, Antar's brother-in-law, Bassam Ayoub, also testified on Antar's behalf. Bassam departed to the United States from Sierra Leone in 1991 due to the civil war. (*Id.* at 104.) Bassam was later granted asylum in the United States and obtained permanent residency. (*Id.*) Bassam indicated that he received a call from Fawase in February or March of 1999, who informed him that

3

Antar had been captured by rebels, subsequently escaped, and now needed help coming to the United States. (*Id.*) Bassam later received a call in July 1999 from Antar, who was in Detroit. (*Id.*) Bassam then drove from Minnesota to Detroit to pick up Antar on July 9, 1999. (*Id.*)

Bassam stated that he contacted an attorney on Antar's behalf the second day after Antar arrived in the United States. (*Id.* at 105.) Bassam stated that the attorney required Antar to bring a passport, birth certificate, and identification. (*Id.*) According to Bassam, since Antar did not have his birth certificate, Bassam contacted his step-brother in Sierra Leone to obtain it. (*Id.*) Bassam testified that his father, who lived in Sierra Leone, brought Antar's birth certificate with him while he was visiting the United States. (*Id.*) Bassam testified that his father did not provide a statement regarding his role in obtaining Antar's birth certificate because his father was recovering from heart surgery and also "did not want to get involved" in immigration proceedings. (*Id.*)

Finally, Antar's sister, Nohad Ayoub, testified on Antar's behalf. (*Id.* at 106.) After arriving in the United States from Sierra Leone in 1992, Nohad was granted asylum and later obtained citizenship. (*Id.*) Nohad kept in touch with Antar until 1994, when she was told by John M'bayo ("M'bayo"), a family friend, that Antar and her father were likely dead because both had disappeared, and their bodies could not be found. (*Id.* at 107.) Nohad claimed she next heard from her brother in late February or early March 1999 and then saw him when he arrived in Detroit on July 12, 1999. (*Id.*) Nohad noted that Antar exhibited unusual behavior that included depression, inability to sleep, and nightmares, and that Antar sought counseling to relieve his symptoms. (*Id.*) Nohad insisted that Antar would be killed if he returned to Sierra Leone, and that he had no family in that country. (*Id.*)

### 3. IJ's Ruling

*a. Credibility*

4

The IJ found that Antar lacked credibility due to three factors. (*Id.* at 110.) First, the IJ stated that Antar provided inconsistent testimony regarding how and when he obtained his birth certificate and passport. Specifically, the IJ noted that Antar claimed at his initial hearing that he had only one birth certificate, which was attached to his Sierra Leonean passport and discovered by M'bayo in the toilet of Antar's burned-down house. (*Id.* at 110.) Antar did not produce this birth certificate at his initial hearing because he claimed he left it at home and, despite promising that he would bring it to his subsequent hearing, he failed to do so and claimed he lost it. (*Id.* at 110.) At the continued hearing, Antar also testified, contrary to his earlier testimony, that he had a second birth certificate issued in 1999, which was delivered to him by his brother-in-law's father, that Antar attached to his TPS application. However, his brother-in-law's father did not offer a statement to corroborate Antar's claim. (*Id.* at 111.) Additionally, Antar indicated that he left Sierra Leone with only the clothes on his back and later received his Sierra Leonean passport in August 2000 when M'bayo discovered it in Antar's burned-down house. (*Id.*) However, Antar submitted a TPS application on June 23, 2000, to which he attached a copy of his Sierra Leonean passport. Antar also submitted a copy of this passport with his asylum application on May 26, 2000. (*Id.*)

Second, the IJ found that Antar was not credible because Antar's assertion that M'bayo retrieved Antar's passport, birth certificate, and family photographs from the toilet was "incredulous." (*Id.*) The IJ noted that M'bayo purportedly provided a faxed letter attesting that he sent Antar his birth certificate and passport, but the IJ stated that the authenticity of the letter was not proven. (*Id.*) Moreover, the IJ concluded that, even if the letter was what it purported to be, it did not corroborate Antar's testimony because it omitted important details regarding where M'bayo purportedly found the documents and how he knew where to search for them. (*Id.* at 111-12.)

5

Finally, the IJ found that Antar was not credible because he failed to provide corroborating evidence to support his claim that he was captured by rebels. (*Id.* at 112.) The IJ noted that M'bayo's letter simply stated that Antar was "captured by rebels" but did not go into any detail about Antar's claim. (*Id.*) Moreover, Antar did not provide any statements or testimony from Fawase, who purportedly took care of Antar after he escaped from Sierra Leone, helped him contact his family in the United States, and obtained a Guinean passport and Canadian visa for him. (*Id.*) Antar also did not provide statements or testimony from Hamka, who allegedly drove him from Canada to Detroit. (*Id.*)

Therefore, based on the three factors cited above, the IJ concluded that, "[s]uccintly stated, the documentation and testimony respondent presented fails to prove who he is or the occurrence of the events he describes. Hence, his application must be denied." (*Id.*)

### b. Merits

#### i. Past Persecution

The IJ concluded that, even if Antar was credible, what Antar described does not rise to the level of past persecution because "the fact that [he] allegedly got caught up in the violence associated with this conflict does not establish persecution." (*Id.* at 113.) The IJ stated, in analyzing a claim of persecution in the context of a civil war, that he must examine the motivation of the group threatening the harm. (*Id.* at 113.) The IJ concluded that Antar was not persecuted by the government of Sierra Leone on account of one of the five protected grounds contained in 8 C.F.R. § 1208.13(b)(1). The IJ stated that Antar produced no evidence that the alleged harm he suffered was motivated by an actual or imputed political ground, and his testimony made no reference to his political opinion or other protected ground, but merely stated he was one of the rebels' few white

6

prisoners. (*Id.*)

### ii. Changed Country Conditions

The IJ concluded that, even if Antar was credible and could establish past persecution, changed conditions in Sierra Leone rebut the presumption of a well-founded fear of future persecution. (J.A. at 113 (citing 8 C.F.R. § 1208.13(b)(1)). Specifically, Antar's asylum claim is premised upon persecution by RUF rebels, but the 2004 State Department Country Report states that the civil conflict in Sierra Leone officially ended in 2002. (*Id.* at 115.) Additionally, the 2004 Country Report states that there were no reports of politically motivated disappearances or political prisoners. (*Id.*) Therefore, the IJ concluded that these changes do not support Antar's position that he has a well-founded fear of persecution if he returned to Sierra Leone. (*Id.*) Similarly, the IJ found that the record evidence is also insufficient to prove Antar's claim for protection under the CAT, which is based on the same facts as his withholding claim.

### c. Removal to Sierra Leone or, in the Alternative, to Lebanon

The IJ ordered Antar removed to Sierra Leone or, in the alternative, to Lebanon. (*Id.* at 116.)

### B. Final Order of the BIA

#### 1. Due Process Claim

The BIA first rejected Antar's claim that the IJ abandoned his role as an impartial arbiter of facts and assumed the role of prosecutor, finding that Antar failed to demonstrate that the IJ's actions deprived him of a full and fair hearing. (J.A. at 6.) The BIA, citing 8 U.S.C. § 1252(b), noted that an IJ may receive evidence, interrogate, examine, and cross-examine the alien or witnesses. (J.A. at 6.) Moreover, the BIA noted that "the IJ fully advised [Antar] of his procedural and substantive rights during the proceedings, and he adequately inquired into the pertinent details

for the respondent's claim for relief from removal." (*Id.*)  Accordingly, the BIA concluded that the IJ's actions did not prejudice the outcome of the hearing, and Antar therefore failed to demonstrate that the IJ deprived him of a full and fair hearing.

## 2. Credibility

The BIA adopted and affirmed the IJ's finding that Antar failed to provide credible testimony and evidence in support of his claim. (*Id.*)  Specifically, the BIA found that the IJ's decision accurately set forth the facts asserted by Antar in support of his claim for relief from removal. (*Id.*)  Moreover, the BIA determined that the IJ's findings of fact have not been shown to be clearly erroneous because:

> In reaching this conclusion, the IJ found various discrepancies which were deemed to adversely impact the respondent's credibility including inconsistent testimony regarding the number and manner in which he obtained his birth certificates, *compare* Tr. at 135 vs. Tr. at 193-96; confusion surrounding his various passports and the dates and manner in which he obtained them; the lack of plausibility with respect to the manner in which his friend retrieved his passport, birth certificate, and photographs, allegedly from a toilet in a house burned to the ground by the rebels, *see. e.g. Dorosh v. Ashcroft,* 398 F.3d 379, 382 (6th Cir. 2004), *citing Matter of M-D-,* 21 I&N Dec. 1180, 1182 (BIA 1998), as well as his failure to present credible corroborative evidence of his capture or a statement from the individual who purportedly assisted him upon his escape from the rebels and in his flight to the United States.  We further note and agree that the respondent failed to adequately establish his identity.

(*Id.*)

## 3. Merits

### *a. Past Persecution*

The BIA rejected the IJ's alternative finding that, even if Antar was credible, Antar failed to show past persecution. (*Id.*) Specifically, the BIA concluded it could not affirm the IJ's alternative finding that Antar could not establish past persecution because, if credible, Antar's asylum application

8

shows that the rebels imputed Antar's support for the government from his Lebanese ethnicity.  (*Id.*)

### b. Changed Country Conditions

However, the BIA adopted and affirmed the IJ's conclusion that, even if Antar's claims were credible, Antar failed to rebut the background evidence indicating there have been significant changes in Sierra Leone, including the end of the civil war in 2002, which "adequately rebuts Antar's asserted fear of return arising from that conflagration." (*Id.*) The BIA noted that Antar's arguments on appeal reiterated his assertions regarding his capture and mistreatment at the hands of the RUF rebels, but they "fail to provide any persuasive basis to disturb the IJ's decision." (*Id.*)

### 4. Removal to Sierra Leone or, in the Alternative, to Lebanon

The BIA found that the IJ did not err in ordering Antar removed to Sierra Leone or, in the alternative, to Lebanon.  (*Id.*)

## II. STANDARD OF REVIEW

The court reviews the BIA's findings of fact, including whether an alien qualifies for relief and protection from removal, under the substantial evidence standard.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992);  *Marku v. Ashcroft,* 380 F.3d 982, 986 (6th Cir. 2004).  Under this deferential standard, administrative findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252 (b)(4)(B); *see also Marku,* 380 F.3d at 986. The court reviews *de novo* alleged due process violations in removal proceedings. *Vasha v. Gonzales,* 410 F.3d 863, 872 (6th Cir. 2005) (citation omitted).

## III. LAW AND ANALYSIS

### A.  Due Process

9

Antar argues he was not afforded due process because "the IJ is biased and ha[d] his mind already made up about the case prior to taking any testimony from [Antar]." (Pet'r Br. at 52.) For example, Antar argues that the IJ shows he is not impartial because: (1) the IJ presented the following hypothetical to Dr. Kamoo: "Let us suppose that [Antar] is from Lebanon or Guinea and not from Sierra Leone and now knows that he is going to be deported to Sierra Leone, a country which he has never been to, wouldn't that cause his mental symptoms?"; (2) the IJ showed no remorse for the petitioner's story or suffering and tried to accuse the petitioner of playing a role in the killing of other people when he was allegedly used as a human shield by the rebels; (3) the IJ tried to accuse Antar of giving false testimony with respect to the passport and birth certificate and failed to let Antar explain himself; and (4) after the IJ sought the assistance of the Forensic Document Lab ("FDL") to evaluate the authenticity of Antar's birth certificate at the July 14, 2005 hearing, the IJ scheduled a hearing on October 19, 2005, announcing that he would issue his decision on that date. However, the IJ denied Antar's motion for a continuance of the October 19, 2005 hearing pending the FDL results, stating that "there is no assurance the FDL will ever produce a probative report," and ultimately issued his decision on September 30, 2005. (*Id.*)

Conversely, the government argues that: (1) nothing in the transcript of the hearing suggests any bias by the IJ; (2) Antar's allegation of bias amounts to mere speculation; and (3) the IJ's recognition of significant inconsistencies in Antar's testimony and Antar's failure to either reconcile these inconsistencies or introduce other evidence in support of his claims does not constitute bias.

Although there is no constitutional right to asylum, aliens facing removal are entitled to due process. *See Zadvydas v. Davis*, 533 U.S. 678, 693-94 (2001). This court must conduct the following two-step inquiry to determine whether Antar was deprived of his constitutional due process rights:

"first, whether there was a defect in the removal proceeding; and second, whether the alien was prejudiced because of it." *Vasha*, 410 F.3d at 872.

### 1. Defect in the Removal Proceedings

It is well-settled that "[a]n IJ . . . shall administer oaths, present and receive evidence, interrogate, examine, and cross-examine the alien or witnesses." 8 U.S.C. § 1252(b). However, this court has recognized that:

> Though "[t]he IJ is afforded broad discretion to control the manner of interrogation in order to ascertain the truth," *Mikhailevitch*, [146 F.3d 384*,* 391 (6th Cir. 1998)] (internal quotation omitted), we have recognized that "[a] neutral judge is one of the most basic due process protections." *Reyes-Melendez v. INS*, 342 F.3d 1001, 1006 (9th Cir. 2003) (internal quotation omitted); *see also Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005) ("It is undisputed that petitioners in such proceedings are entitled to an unbiased arbiter who has not prejudged their claims.").

*Vasha,* 410 F.3d at 873. In *Vasha*, the court held that the IJ "crossed the line from impartial arbiter to government advocate" when, in reaching her decision, the IJ relied on evidence that she obtained from an off-the-record conversation with the court's clerk that was not produced by the parties at the hearing.

Conversely, in *Mikhailevitch v. INS*, 146 F.3d at 391, the court rejected the petitioner's claim that he was denied due process because the IJ allegedly questioned him in an intimidating manner and prevented him from fully explaining instances of past persecution that he suffered in Belarus. Instead, the court found that the IJ's questions "were apparently intended to clarify a time frame and focus more directly upon [petitioner's] situation, not to intimidate him or prevent him from presenting relevant evidence on his own behalf." *See also Iliev v. INS*, 127 F.3d 638, 643 (7th Cir. 1997) ("Although the [IJ] may have been 'brusque,' and perhaps could have achieved his objective in a more courteous manner, it is difficult to say on the cold record that his approach warrants criticism;

11

certainly, he did not deny a fair trial.").

Here, as in *Mikhailevitch*, the IJ's hypothetical to Dr. Kamoo does not constitute evidence of bias. Rather, the hypothetical appears to have been an attempt to clarify Dr. Kamoo's testimony about Antar's mental health symptoms. Similarly, as in *Mikhailevitch*, the IJ's questions to Antar regarding his testimony with respect to his role as a human shield and how he obtained his passport or birth certificates appear designed to elicit relevant testimony from Antar and resolve any inconsistencies, not to intimidate him. As in *Iliev*, while the IJ may have been brusque and perhaps his objective could have been achieved in a more courteous manner, it does not constitute a defect in the removal proceedings. Moreover, the court finds that the IJ's decision to deny Antar a continuance to incorporate the FDL results of Antar's birth certificate does not constitute a due process violation because a decision to grant a continuance is completely discretionary.

2. No Prejudice

The court finds that, even if there had been a defect in the proceedings that resulted in a violation of Antar's due process rights, Antar was not prejudiced by any alleged defect. *See Vasha*, 410 F.3d at 875 (denying the petition for review because, although there was a defect in the removal proceedings that was "quite troubling" and denied the petitioner his due process rights, the petitioner did not allege, and there was no evidence, that he was prejudiced by the defect). Specifically, Antar's arguments that his due process rights were violated all essentially relate to the IJ's determination that Antar was not credible. Yet, even if the IJ found that Antar was credible, the outcome of the removal proceedings would remain the same because, as discussed below, the court finds that substantial evidence shows that Antar did not have a well-founded fear of persecution in light of fundamental changes in Sierra Leone. Accordingly, since Antar would not have been prejudiced even if there had

12

been a defect in the removal proceeding, the court finds that Antar's due process claim does not entitle him to relief.

## B. Credibility

Antar argues the BIA erred in concluding, based on minor inconsistencies, that Antar was not credible because Antar submitted significant evidence in support of his application. (Pet'r Br. at 41-51.) Conversely, the government argues that substantial evidence that goes to the heart of Antar's claims support the BIA's adverse credibility determination. (Resp't Br. at 21-24.) The court need not resolve the issue of credibility because, as discussed below, the court affirms the BIA's finding that Antar is not entitled to asylum, withholding of removal, or protection under the CAT because Antar is unable to establish that he has a well-founded fear of future persecution or likelihood of torture.

## C. Well-Founded Fear of Persecution or Torture

Antar argues that he is entitled to relief based upon the severity of his past persecution and therefore need not show a likelihood of future persecution. (Pet'r Br. at 31, citing *Matter of Chen,* 20 I&N Dec. 16 (BIA 1989)). Alternatively, Antar points to the testimony of Dr. Kamoo, who opined that Antar will suffer an extreme exacerbation of his mental health symptoms if he returns to Sierra Leone. (J.A. at 104.) Antar also proffered the affidavit of Dr. Jeremy Presholdt, a professor of African and World History at Northeastern University, who had recently returned from a two-week visit to Sierra Leone where he conducted onsite investigations in the capital city of Freetown and in the Bo, Kono and Kenema Districts. (*Id.* at 746.) Dr. Presholdt stated that RUF rebels roam the country freely because they were granted amnesty from prosecution by the government and opined that Antar could suffer psychological and economic distress if he returned to Sierra Leone and, if

13

armed conflict were to resume, possibly physical harm.  (*Id.* at 748.)

The government argues that, assuming that Antar is credible and even assuming Antar can demonstrate past persecution, Antar must show a well-founded fear of future persecution or a likelihood of torture.  The government contends that the IJ and BIA were correct in concluding that fundamentally changed conditions in Sierra Leone noted in the 2004 State Department Country Report, such as the absence of both politically motivated disappearances and the capture of political prisoners, adequately rebut Antar's fear of future persecution.

 1. Statutory Framework of Asylum, Withholding of Removal, and CAT

 The Attorney General may, in his discretion, grant asylum to an alien who demonstrates that he is a refugee within the meaning of the Immigration Nationality Act.  *See* 8 U.S.C. § 1158(b)(1)(A).  An alien qualifies as a refugee if he establishes past persecution or a well-founded fear of future persecution in his country of origin on account of a protected ground.  *See* 8 U.S.C. § 1101 (a)(42)(A); 8 C.F.R.§ 1208.13(b).  If the applicant is able to prove past persecution, a presumption of future persecution arises.  8 C.F.R.  § 1208.13(b)(1).  The government may rebut the presumption of future persecution by establishing by a preponderance of the evidence that, since the past persecution occurred, conditions in the applicant's country have changed to an extent that the applicant no longer has a well-founded fear of being persecuted upon return.  *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003) (citing *Mikhailevitch*, 146 F.3d at 390).  This court has explained the government's burden of proof with respect to fundamental change in the applicant's country conditions as follows:

> The INS must do more than show that circumstances in the country have fundamentally changed; the INS must also show that such change negates the particular applicant's well-founded fear of persecution.  *Id.  See also Krastev v. INS*,

14

292 F.3d 1268, 1276-77 (10th Cir. 2002) (BIA must conduct individualized well-founded fear analysis); *Chand v. INS*, 222 F.3d 1066, 1079 (9th Cir. 2000) (whether or not a particular applicant's fear is rebutted by a general change in country conditions requires an individualized analysis that focuses on the specific harm suffered and the relationship to it of information contained in a country report); *Fergiste v. INS*, 138 F.3d 14, 19 (1st Cir. 1998) (general evidence of changed country conditions is insufficient to show that an applicant no longer has a well-founded fear of persecution); Charles Gordon et al., *Immigration Law & Procedure* § 34.02[9][d] (Rev. ed. 2002).

*Id.* at 452.

Whereas asylum is discretionary, withholding of removal under the INA is mandatory if an alien demonstrates that his life or freedom would be threatened in the proposed country of removal on account of a protected ground. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 1208.16(b). An applicant must establish a clear probability of future persecution by demonstrating that it is "more likely than not" that he will be persecuted on account of a protected ground upon his return to the proposed country of removal. *See* 8 C.F.R. § 1208.16(b)(2). The standard for withholding of removal is more stringent than the standard for asylum. *Liti v. Gonzales,* 411 F.3d 631, 640 (6th Cir. 2005).

Likewise, to be eligible for protection under CAT, an applicant must establish that it is "more likely than not" that he would be tortured if returned to the country of removal. *See* C.F.R. § 1208.16(b); *Liti*, 411 F.3d at 641. The standard for relief under CAT is more stringent than the standard for asylum. *Liti*, 411 F.3d at 641.

2. Application

As discussed above, there is significant case law supporting the government's position that any presumption of future persecution can be rebutted in the face of significantly changed country conditions, and that past persecution alone is not sufficient to support entitlement to asylum, withholding of removal, or CAT protection. In *Liti,* 411 F.3d at 641, this court reversed the BIA's

15

determination that the applicants were not credible with respect to past persecution for engaging in anti-communist protests in Albania. However, the *Liti* court affirmed the BIA's order denying the applicants' claims for asylum because State Department country reports indicated that conditions in Albania had fundamentally changed to the extent that anti-communist protestors were no longer persecuted, and the applicants failed to rebut the government's evidence by producing their own evidence that anti-communist protestors were still persecuted in Albania. Since the applicants failed to establish their eligibility for asylum, the *Liti* court concluded that the applicants could not satisfy the more stringent standard for withholding of removal or relief under the CAT. *Id.* (citing *Koliada v. INS*, 259 F.3d 482, 489 (6th Cir. 2001)); *Pilica v. Ashcroft*, 388 F.3d 941, 955 (6th Cir. 2004); *Yu v. Ashcroft,* 364 F.3d 700, 703 n.3 (6th Cir. 2004).

Like the court in *Liti,* the IJ and BIA found that any presumption of future persecution was rebutted by the 2004 State Department Report for Sierra Leone, which stated that there were no reports of politically motivated disappearances or of political prisoners. Significantly, while the IJ and BIA did not explicitly note this fact in analyzing the change in conditions in Sierra Leone, the basis for both Antar's past persecution and fear of future persecution was the role of RUF rebels in politically motivated disappearances and the capture of political prisoners. Further buttressing the BIA's holding are the 2004 State Department Report and the 2005 Human Rights Watch Report noting that the Sierra Leonean government provided a forum for publicly airing the grievances of victims and the confessions of perpetrators from the civil war, and over 100,000 citizens had participated in this Truth and Reconciliation process by the time the hearings ended. (J.A. 497-505; 513.) Therefore, the court finds that the BIA made more than a generalized determination that circumstances in the country have fundamentally changed and instead engaged in an "individualized

16

analysis focusing on the specific harm suffered and the relationship to it of information contained in a country report." *Chand v. INS,* 222 F.3d 1066, 1079 (9th Cir. 2000).

Like the applicants in *Liti,* Antar also failed to produce evidence of his own to rebut the government's evidence that, due to changed conditions in Sierra Leone, Antar does not have a well-founded fear of future persecution at the hands of RUF rebels. Dr. Kamoo's testimony regarding the possible exacerbation of Antar's mental health symptoms if he returns to Sierra Leone is not relevant and thus does not serve as corroborative evidence that Antar has a well-founded fear of future persecution by the rebels. Similarly, even if Dr. Presholdt, a professor of African and World History, was qualified to opine about Antar's mental health symptoms, it is not corroborative for the same reason. Finally, Dr. Presholdt's speculation that Antar might be subject to physical harm in the event that armed conflict resumes is not compelling corroborative evidence of Antar's well-founded fear of future persecution at the hands of RUF rebels.

For the reasons stated above, the court finds that the government met its burden of rebutting the presumption of future persecution by establishing by a preponderance of the evidence that conditions in Sierra Leone have changed to an extent that Antar no longer has a well-founded fear of being persecuted by RUF rebels upon his return. Accordingly, the court affirms the BIA's determination that Antar failed to establish his eligibility for asylum. Moreover, like the *Liti* court, this court finds that, since Antar failed to establish his eligibility for asylum, he cannot satisfy the more stringent standard for withholding of removal or relief under the CAT.

### D. Removal to Sierra Leone or, in the Alternative, to Lebanon

Antar objects to being removed to Sierra Leone or, in the alternative, to Lebanon. First, Antar argues that removal to Sierra Leone is improper because "it is apparent from the record and the [IJ's]

17

decision that the [IJ] did not believe that Antar last resided in Sierra Leone or that he is from Sierra Leone." (Pet'r Br. at 55.) Secondly, Antar argues that the IJ erred by ordering Antar removed, in the alternative, to Lebanon because Antar presented evidence that he is not a citizen or national of Lebanon. (*Id.*)

When the alien does not designate a country of removal, the Attorney General is required by statute to remove the alien to any country where the alien is a "subject, national, or citizen" unless the government of the country refuses to accept the alien. 8 U.S.C. § 1231(b)(2)(D). When the alien cannot be removed to the country of nationality or citizenship, then the Attorney General is required to designate a country that falls into one of seven categories listed in 8 U.S.C. § 1231(b)(2)(E). Here, pursuant to 8 U.S.C. § 1231(b)(2)(E)(iv), the IJ was clearly permitted to designate Sierra Leone as the first country of removal because Antar was born there. Similarly, the Attorney General may properly designate Lebanon as an alternate country of removal if Lebanon would accept him into the country, and if removal to Sierra Leone is "impracticable, inadvisable, or impossible." 8 U.S.C. § 1231(b)(2)(E). Accordingly, this court finds that the BIA did not err when it removed Antar to Sierra Leone or, in the alternative, to Lebanon.

## IV. CONCLUSION

The court AFFIRMS the BIA's final order denying Antar asylum, withholding of removal, and protection under the CAT because Antar cannot establish a well-founded fear of persecution or a likelihood of torture in light of changed country conditions in Sierra Leone.