NOT RECOMMENDED FOR PUBLICATION
File Name: 09a0561n.06

No. 08-3842

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 12, 2009**
LEONARD GREEN, Clerk

ABINDERBIR SINGH,               )
                               )
    Petitioner,                )
                               )
v.                             )    ON PETITION FOR REVIEW FROM THE
                               )    BOARD OF IMMIGRATION APPEALS
                               )
ERIC HOLDER, United States Attorney )
General,                       )    OPINION
                               )
    Respondent.                )
_____)

**Before: GILMAN, COOK, and FARRIS, Circuit Judges.**[*]

**RONALD LEE GILMAN, Circuit Judge.** Abinderbir Singh, a native and citizen of India,

lawfully entered the United States in March 1999 as a temporary visitor. He filed an application four

months later for asylum, withholding of removal, and relief under the Convention Against Torture

(CAT), claiming political and religious persecution in India based on his being a member of the Sikh

religion. In 2006, an Immigration Judge (IJ) conducted a hearing on the case and denied Singh's

application, finding that Singh was not credible. The Board of Immigration Appeals (BIA) affirmed

the IJ's decision, and Singh appealed. For the reasons set forth below, we **DENY** Singh's petition

for review.

---

[*]The Honorable Jerome Farris, Senior United States Circuit Judge for the Court of Appeals for the Ninth
Circuit, sitting by designation.

## I. BACKGROUND

**A.    Factual background**

Singh was raised in the Sikh religious tradition in the Amritsar District of Punjab, India. While a student in college, he joined the "All-India Sikh Student Federation" (AISSF). At the merits hearing before the IJ, Singh testified that the AISSF is an organization dedicated to promoting the Sikh religion among students, and that it is a "very peaceful party." Part of Singh's responsibilities was distributing religious literature. In connection with his activities, he was allegedly arrested by the police in April 1984. He testified at the hearing that he was taken to the police station, held for three days, and beaten. The police warned him not to distribute any more religious literature.

Singh was arrested again by the police later in 1984 as a result of clashes between the Indian army and Sikh religious leaders in Punjab. The Indian army ransacked the Golden Temple, the main place of Sikh worship, and arrested hundreds of Sikhs from the region, including Singh and his cousin. Singh testified that he was present during the ransacking of the Temple, and that "three or four" Sikhs were killed. After being arrested, he was held in a "camp" and allegedly beaten "in the morning and evening." He was released almost a week later, after being warned again not to distribute religious literature. After these incidents, the AISSF was declared to be an illegal organization by the Indian government. Singh then left the Punjab region and went to live in Calcutta for a year and a half. He returned to Punjab when a Sikh-led government came to power in the region.

In 1989, Singh joined Shiromani Akali Dal, a political party active in the Punjab region that advocated a separate Sikh state. He eventually became the vice president of the rural areas in that

organization. In September 1995, Singh was arrested and detained for four days because he agitated for the release from prison of another party official. Singh testified that he was interrogated, beaten by a stick, and hung upside down while in custody. His father arranged for his release by bribing police officers.

In 1994, Singh's infant son died in an incident involving the police. Singh testified at the hearing that he and his family were driving through a checkpoint about two or three kilometers from Amritsar, his hometown. The police recognized him as a party leader, followed him in a Jeep after he went through the checkpoint, and ordered him to stop. Singh and his wife were then told to step out of the car. As his wife was getting out, the police pulled her. In the ensuing "scuffle," the six-month-old infant was dropped on the ground and seriously injured. The Singhs brought their son to a family doctor for treatment, but the child did not survive. Singh did not file a complaint with the police about the death, but did inform his party.

In 1998, Singh was again arrested and detained for three days after he went to the "SDM," a "subdivision district" in the region "responsible for law," to complain about the arrest of his uncle. Singh testified that he was peaceful while at the SDM office, but the police came to his home that evening and arrested him. After he was released, the police visited Singh's home again, but he was not there at the time. Singh testified that the policemen told his father that they were there to arrest Singh again because they suspected that he was hosting a meeting of militants at his home. Afraid to go home, Singh left for a neighboring town. From there, he obtained a tourist visa and entered the United States.

B. **Procedural history**

The government initiated removal proceedings against Singh in January 2000. Singh appeared before the immigration court and conceded removability. His case was initially set to be heard in San Francisco, but was later transferred to Michigan, where he resides. In addition to his own testimony, Singh's wife and his cousin provided evidence at Singh's hearing.

At the end of the hearing, the IJ delivered an oral opinion in which she found Singh not credible and denied his application for asylum, withholding of removal, and relief under the CAT. The IJ based her credibility finding on an exhaustive list of inconsistencies between Singh's written asylum application and his hearing testimony. She also concluded that even if Singh was credible, he had no reasonable basis to fear countrywide persecution in India because Singh testified at the hearing that he was able to relocate to Calcutta for one and a half years without incident. The IJ therefore denied Singh's application on this alternative ground as well.

Following Singh's appeal, the BIA affirmed the IJ's decision, concluding that her findings of fact, including her assessment of Singh's credibility, were not clearly erroneous. It found that

> the principal shortcomings and inconsistencies cited by the Immigration Judge are present in the record, are substantial and go to the heart of the respondent's asylum claim, and have not been adequately explained by the respondent.

The BIA also found that Singh failed to submit reasonably available corroborative evidence. This timely appeal followed.

## II. ANALYSIS

**A.     Standard of review**

"Because the BIA adopted the IJ's decision with additional commentary, we review the decision of the IJ, as supplemented by the BIA, as the final administrative order." *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007). Questions of law involving immigration proceedings are reviewed de novo. *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004). The IJ's factual findings, on the other hand, including a determination that the petitioner failed to establish eligibility for asylum or withholding of removal, will not be disturbed if substantial evidence supports such determinations. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (holding that a factfinder's rulings will be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole" (citation omitted)). Under this standard, we will not reverse a factual determination of the IJ unless we find "that the evidence not only supports a contrary conclusion, but *compels* it." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (emphasis in original).

**B.     The statutory framework**

Under the Immigration and Nationality Act (INA), 8 U.S.C. § 1158(b), the U.S. Attorney General has discretion to grant asylum to a refugee. The disposition of an application for asylum involves a two-step inquiry: (1) whether the applicant qualifies as a "refugee" as defined in 8 U.S.C. § 1101(a)(42)(A), and (2) whether the applicant "merits a favorable exercise of discretion by the Attorney General." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5 (1987)).

Section 1101(a)942)(A) of the INA defines a "refugee" as an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

An applicant may therefore establish eligibility for asylum by showing that he or she (1) has suffered past persecution, or (2) has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b). The burden is on the applicant to establish that he or she qualifies as a refugee. 8 C.F.R. § 1208.13(a). If credible, the applicant's testimony "may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.13(a).

Once the applicant shows that he or she has suffered from past persecution, the applicant is presumed to have a well-founded fear of future persecution. *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998). This presumption can be rebutted by the government only through establishing by a preponderance of the evidence that, since the persecution occurred, conditions in the applicant's home country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return. *Id.*

## C.    The IJ's credibility finding

The IJ's opinion contains an exhaustive analysis of Singh's application. We shall outline only the main points here. Most importantly, the IJ found a number of inconsistencies regarding the circumstances surrounding the death of Singh's son. Singh's written application stated that "one police snatched my son from my wife and threw him on the ground." But at the hearing, both Singh and his wife testified that his son "fell" from his wife's lap as she was being forced out of the vehicle.

The IJ also expressed concern about the two different death certificates that Singh provided to allegedly verify his son's death, each bearing a different date of death, a different date of registration for the death, and a different place of death. Moreover, Singh's written application,

unlike his testimony at the hearing, omitted any reference to the medical treatment that his son received. Singh also never submitted any medical records or affidavit from the family doctor regarding his son's treatment, even though such evidence was reasonably available because his brother, a United States citizen, had been to India and back twice between 1996 and the date of the hearing.

The IJ further found that Singh's description of his involvement with the AISSF was riddled with inconsistencies. Singh's testimony and the documents he submitted alluded to three different dates regarding when he joined the AISSF. Singh also gave inconsistent descriptions about the nature of the AISSF. In his asylum application, Singh described the AISSF as a political organization, and specifically described his role in organizing the training camps as "very useful to preach religion, create political awareness among young Sikhs and recruit them in the federation." But at the hearing, he testified that the AISSF is a student religious organization that is not involved in politics. The IJ also questioned Singh's characterization of the AISSF as "peaceful," "nonmilitant," and "faction-free," which she found to be in conflict with the country-condition report for India and the testimony of Singh's cousin at the hearing. Finally, the IJ pointed to the inconsistent testimony of Singh and his wife regarding how long Singh remained active with the AISSF.

The IJ also found that Singh omitted key details regarding his arrests. With respect to the April 1984 arrest, Singh stated in his application that he was interrogated by the police regarding his political activities and the source of financial aid to the AISSF. But Singh made no mention during his direct examination of being interrogated by the police, even after his attorney explicitly asked

him if this had occurred. The IJ further noted that Singh gave inconsistent dates as to his second arrest in 1984. Singh also gave conflicting accounts of how many people died during the Golden Temple incident preceding the second arrest. His written application stated that "hundreds of innocent Sikhs" were killed, but when he testified at the hearing, he stated that only three or four people had died.

Finally, the IJ found that Singh gave conflicting testimony about his involvement in the Shiromani Akali Dal political party. Singh testified at the hearing that he held no office other than the vice president of the rural areas. But in his written application, he stated that in 1990 he was elected the president of the party's "cooperative society" consisting of the villages of Vachhoa, Bath, Loharka, and Ferveria, and a director from the Ajnala Zone. Singh made no mention of these positions at the hearing. Moreover, in his asylum application, Singh failed to mention being beaten with a stick and hung upside down during his arrest and detention in 1995 in connection with his involvement with the Shiromani Akali Dal party.

In sum, we believe that the IJ's factual findings are supported by substantial evidence in the record. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). The IJ pointed to numerous inconsistencies with regard to each of Singh's alleged incidents of persecution, and some of these inconsistencies go to the heart of Singh's claim and cast doubt on his credibility. Especially damaging to Singh's credibility determination are: (1) the numerous inconsistencies regarding his membership and level of involvement in the AISSF and the Shiromani Akali Dal party; (2) the inconsistencies between his written application and hearing testimony regarding the details of his April 1984 arrest and his 1995 arrest; (3) the conflicting accounts in the written application and in

the hearing testimony about how his son died; and (4) the two death certificates that he submitted to verify his son's death, each containing significantly different information. Because Singh's membership in the AISSF and the Shiromani Akali Dal, the alleged arrests, and the death of his child are central to his allegations of government persecution for his participation in Sikh organizations, these inconsistencies directly affect his asylum claim. *See Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004) ("[A]dverse credibility finding[s] must be based on issues that go to the heart of the applicant's claim."). The evidence in the record thus does not "compel" a contrary conclusion to the IJ's adverse credibility determination. *See* 8 U.S.C. § 1252 (b)(4)(B); *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004).

Singh therefore failed to meet his burden of establishing that he is a refugee within the statutory definition of the term because he did not provide credible evidence that he has suffered past persecution or has a well-founded fear of future persecution. *See* 8 C.F.R. § 1208.13(a)-(b). Because the IJ's adverse credibility determination is supported by substantial evidence, we need not reach the issue of whether the IJ properly denied Singh's asylum application on the alternative grounds that, even if Singh was credible, he had no reasonable basis to fear countrywide persecution in India.

Singh's other claims—for withholding of removal and relief under the CAT—are similarly without merit because they each require an applicant to meet an even higher burden of proof than is needed to establish an asylum claim. *See Khalili v. Holder*, 557 F.3d 429, 435-36 (6th Cir. 2009) (withholding of removal); *Ali v. Reno*, 237 F.3d 591, 596-97 (6th Cir. 2001) (relief under the CAT).

## III. CONCLUSION

For all of the reasons set forth above, we **DENY** Singh's petition for review.