RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0173p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GHAZI ZOARAB,

|   |   |
|---|---|
| *Petitioner,* | |
| *v.* | No. 07-3624 |
| MICHAEL B. MUKASEY, | |
| *Respondent.* | |

On Petition for Review of a Decision
of the Board of Immigration Appeals.
No. A79 290 728.

Argued: April 22, 2008

Decided and Filed: May 6, 2008

Before: GILMAN, ROGERS, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Cassandra J. Wiemken, STITES & HARBISON, Louisville, Kentucky, for Petitioner. Shahrzad Baghai, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Cassandra J. Wiemken, Clark C. Johnson, STITES & HARBISON, Louisville, Kentucky, for Petitioner. Greg D. Mack, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

## OPINION

---

McKEAGUE, Circuit Judge. In this asylum case, Ghazi Zoarab asks the court to give controlling weight to the unique circumstances of the monarchical government in the United Arab Emirates (the "U.A.E."), where any expression against the integrity of a royal family member is said to constitute political expression. Contrary to Zoarab's contention, however, there is little in the record to suggest that his comments about a soured business deal with a prince amounted to political speech. Accordingly, we deny his petition for review.

1

**I**

**A.    Factual Background**

Zoarab was born in 1949 in Rafah, Palestine, located in the then-Egyptian-controlled territory of the Gaza Strip.  Zoarab lived there through high school, and attended college in Beirut, Lebanon.  He has not returned to his native Palestine since leaving for college in 1972.  After graduation, he resided briefly in Egypt on a now-expired visa.

While living in Egypt, a bank in the U.A.E. offered Zoarab a job, which he accepted.  He obtained resident status in the U.A.E. conditioned on continued employment.  Over the course of nineteen years, the bank promoted him to director of accounting, a position for which he enjoyed increased compensation and social standing.  He testified that he earned approximately $1,500/month at the bank.

Briefly, the U.A.E. is a federation of seven emirates with no democratically elected institutions or political parties.  Political rule is patriarchal, with allegiance defined by loyalty to tribal leaders and leaders of individual emirates, and with freedoms of speech and press restricted by the government.  The U.A.E.'s constitution prohibits torture, arbitrary arrest and detention, and entry into homes without the owner's permission, although the U.S. Department of State has noted incidents of flogging and incommunicado detention imposed under Shari'a law.  Each emirate has it own independent police force.  According to the State Department's 2003 country report, there were no reports of human rights abuses by the police forces.

In 1996, Zoarab and his cousin-in-law, Mousa Zoarab, invested in Al-Wafa Brokers & Intermediaries ("Al-Wafa").  H.E. Shaikh Mohammad Bin Saqr Al Qasimi ("Prince Mohammad"), the third son of the crown prince of Ras Al Khaimah (one of the U.A.E.'s seven emirates) as well as the emirate's director of judicial courts, was the principal owner of Al-Wafa.  Al-Wafa issued receipts to Zoarab and his cousin-in-law and other investors securing at least fifty percent of their investments in case of insolvency or dissolution.  The company went bankrupt in 1999.  At the time, Zoarab's initial investment of $50,000 was valued at $30,000.  He was unsuccessful in collecting the secured portion of his investment, so he and his cousin-in-law went to Prince Mohammad's office to try to collect in person.  When they were barred from meeting with the Prince, Zoarab and his cousin-in-law angrily accused him of being a thief.

Later that day, Mousa Zoarab was arrested in his home in Ras Al Khaimah.  He was detained for approximately six months.  During his detention, he suffered physical abuse and hunger.  After his release, he required disc surgery for back pain due at least in part to his imprisonment.  Additionally, the Prince had him fired from his job as a teacher.  Since his release, Mousa Zoarab and his family still live in Ras Al Khaimah, where he now works as a car salesman.

Mousa Zoarab's wife called to warn Zoarab shortly after her husband's arrest.  Taking heed, Zoarab did not return to his home in Ajman, a neighboring emirate in which Prince Mohammad had no authority.  He stayed with friends and family for approximately four months, returning home from time to time to get personal items and to check on his family.  During this period, Prince Mohammad sent security guards to Zoarab's home at least twice.  The guards questioned Zoarab's wife, friends, and neighbors about his whereabouts, but never entered his home.

Eventually, the director of the bank asked Zoarab to resign from his job, which Zoarab did in March 2000.  The bank paid him approximately $20,000 in severance pay.  He could have maintained his resident status by seeking employment with another employer-sponsor.  Zoarab testified, however, that he could not seek new employment in the U.A.E. because doing so would have made him vulnerable to the Prince's guards who were looking for him.  Without employment

or some other ground for residency in the U.A.E., he applied for and received a visa to enter the United States in July 2000.

Currently, Zoarab's wife and four of his six children reside in Ajman. His wife is employed. The remaining two children attend medical school in Egypt.

## B.　　Procedural History

Zoarab entered the United States in August 2000 as a non-immigrant visitor for pleasure and subsequently overstayed his visa. He applied for asylum in March 2001. The former Immigration and Naturalization Services referred his application to an immigration judge ("IJ"). Zoarab made his initial appearance before the IJ in February 2004. He admitted the allegations made in the notice to appear and asked for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85, 23 I.L.M. 1027 ("CAT"). Although he declined to designate a country of removal and asked the IJ to reserve the issue, he did not object when the IJ designated Israel as the country of removal and later changed the designation to Palestine.

In August 2005, Zoarab appeared again before the IJ for his hearing. Zoarab testified on his own behalf. Despite finding Zoarab to be a credible witness, the IJ denied Zoarab any relief. The main deficiency, in the IJ's opinion, was the lack of a nexus between Zoarab's reasons for his feared persecution and any expression of political opinion. Zoarab's interactions with the Prince centered on a personal business dispute, not a political one. Moreover, even assuming arguendo that Zoarab's conduct could be considered political, the applicant had not carried his burden of establishing a well-founded fear of future persecution. Among other things, (a) Zoarab and his family did not live in the same emirate as his cousin-in-law and thus likely were outside of the Prince's jurisdiction; (b) the Prince's guards were not abusive to Zoarab's wife and children and the guards' behavior indicated that they were not very serious about locating Zoarab; and (c) members of Zoarab's family have continued to live in the U.A.E. without incident.

Zoarab appealed to the Board of Immigration Appeals (the "BIA" or "Board"). The BIA dismissed his appeal, adopting and affirming the IJ's decision as well as providing additional reasons for the dismissal. Even accepting Zoarab's argument that his confrontation with the Prince was an expression of political opinion, the BIA concluded that the incidents did not amount to past persecution or grounds for a well-founded fear of future persecution.

Zoarab petitioned this court for review.

## II

## A.　　Standard of Review

Where, as here, the BIA adopts and affirms the IJ's opinion, but provides additional reasons for its ruling, we review the IJ's opinion as well as the BIA's additional reasons. *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005). We review de novo the legal determinations made by the IJ or BIA, but review factual findings under the deferential "substantial evidence" standard. *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998). Under the latter standard, we must uphold the administrative decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole," and may reverse only if the evidence compels a different result. *Ramaj v. Gonzales,* 466 F.3d 520, 527 (6th Cir. 2006) (citation omitted). The IJ found Zoarab to be credible; therefore, we accept the factual statements in the petition and testimony as true. *Gilaj*, 408 F.3d at 285-86.

**B.      Asylum**

**1.      In General**

The Attorney General may grant asylum to a refugee. 8 U.S.C. § 1158(b)(1); *Namo v. Gonzales*, 401 F.3d 453, 456 (6th Cir. 2005). A refugee is any person who is outside of the country of the person's nationality or last habitual residence and who is unable or unwilling to return to that country because of past persecution or a well-founded fear of future persecution. *Rreshpja v. Gonzales*, 420 F.3d 551, 554 (6th Cir. 2005). To establish persecution, the applicant must prove that the foreign government "specifically targeted" the person for abuse. *Gilaj*, 408 F.3d at 285-86. If the applicant demonstrates past persecution, there is a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1); *Namo*, 401 F.3d at 456. Otherwise, an applicant can obtain asylum based on a fear of future persecution only by showing that the fear is subjectively genuine and objectively reasonable. *Namo*, 401 F.3d at 456.

Importantly, the purported persecution must be grounded in one of five statutorily defined categories: race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42). If the ill-treatment was motivated by something other than one of these five circumstances, then the applicant cannot be considered a refugee for purpose of asylum. Although the applicant "cannot be expected to provide direct proof of [a] persecutor's motives," a court may not presume that persecution is on account of one of the statutory grounds. *INS v. Elias-Zacarias*, 502 U.S. 478, 482-84 (1992). Where a court "cannot state with conviction what motivated" the purported persecutor, the court "must defer to the BIA's own findings" under the deferential substantial-evidence standard. *Marquez v. INS*, 105 F.3d 374, 381 (7th Cir. 1997).

**2.      Nexus Between Purported Persecution and Political Opinion**

Zoarab contends that because the Prince is a member of the U.A.E. royalty, he is an embodiment of the government. Thus, impugning the integrity of the Prince is the same as impugning the integrity of the government. By calling the Prince a thief, so the argument goes, Zoarab expressed a political opinion that identified him as a threat to the government for which he was and fears will be persecuted. The IJ rejected the argument, characterizing the matter as a personal business dispute, not a political matter.

The IJ's conclusion is supported by substantial evidence. Zoarab was clearly acting as an angry investor, not a political dissident, when he and his cousin-in-law sought to confront the Prince. Asylum is not available to an alien who fears retribution solely over personal matters. *Matter of Y-G*, 20 I & N Dec. 794, 799 (BIA 1994) (explaining that a love quarrel with a Haitian soldier was a "purely personal matter"); *see also Matter of Pierre*, 15 I & N Dec. 461, 463 (BIA 1971) (holding that a fear of retribution from a husband, a high political official, was a "strictly personal" matter). Courts have routinely rejected asylum applications grounded in personal disputes because "without a firm footing in one of the five protected bases, asylum law offers no succor." *Marquez*, 105 F.3d at 380-81 (concluding that a commercial dispute with a Philippine military officer was "apolitical"); *see also Silva v. Ashcroft*, 394 F.3d 1, 6 (1st Cir. 2005) (rejecting an asylum claim based on the applicant's whistleblowing against a corrupt employer as "essentially a personal dispute"); *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) ("Evidence must be presented which suggests that the applicant was persecuted *on account of* or *because of* the political opinion." (emphasis in original)); *Iliev v. INS*, 127 F.3d 638, 642 (7th Cir. 1997) (holding that a dispute with a Bulgarian secret service agent over employment was "personal, not political"); *Huaman-Cornelio v. BIA*, 979 F.2d 995, 1000 (4th Cir. 1992) ("Even aliens with a 'well-founded fear' of persecution supported by concrete facts are not eligible for asylum if those facts indicate only that the alien fears retribution over purely personal matters . . . .").

The Seventh Circuit's decision in *Marquez* is instructive. Like Zoarab, Marquez and his wife had a dispute with government authorities after a commercial project went south. *Marquez*, 105 F.3d at 377. Harassment of the couple began after Marquez denounced on public radio the prevailing corruption in his country. *Id.* The Seventh Circuit acknowledged that "political agitation against state corruption might well be [a ground for asylum]," but the court did not find that Marquez's actions established a sufficient ground. *Id.* at 381. Marquez's public outburst against certain officials did not convince the court that the harassment was on account of political speech. *Id.* Rather, the dispute between Marquez and the public officials was motivated by "greed and jealousy, not politics." *Id.* at 380. The court explained that its conclusion may have been different if the applicant "had founded an anticorruption political party, or assumed an active role in one. Or that he had spoken out repeatedly as a public gadfly about reforming a corruption-ridden government." *Id.* at 381.

Zoarab relies principally on a decision of the Ninth Circuit, *Grava v. INS*, 205 F.3d 1177 (9th Cir. 2000). In that case, the asylum applicant had served as a policeman and a customs officer in the Philippines. *Id.* at 1179. In the course of his official duties, he uncovered widespread and entrenched corruption by his supervisors. *Id.* He eventually went public with his findings; thereafter, he received death threats, his property was vandalized, and his pets were poisoned. *Id.* at 1180. He and his family sought asylum in the United States, which the BIA rejected. *Id.* On petition for review, the Ninth Circuit reversed. The court recognized that whistleblowing could, under certain circumstances, constitute political activity. *Id.* at 1181. The court went on to decree: "When the alleged corruption is *inextricably intertwined* with government operation, the exposure and prosecution of such an abuse of public trust is necessarily political." *Id.* (emphasis added). Concluding that the BIA had used the wrong legal standard for political activity, the court remanded the case back to the BIA to determine whether the applicant had a well-founded fear of persecution. *Id.* at 1182.

Zoarab contends that the interests of the Prince are inextricably intertwined with the interests of the government, and, therefore, calling the former a thief is akin to calling the government corrupt. As recognized in *Marku*, the Ninth Circuit's decision in *Grava* has no precedential authority in this circuit. 380 F.3d at 988. Nor do Zoarab's circumstances fit within *Grava*'s logic. First, there is nothing in the record to suggest that Al-Wafa had any direct involvement in government operations. Any problems associated with the management or administration of the private business venture thus cannot be linked with corruption involving government operations.

Moreover, there are differences of degree and kind between the public campaign in *Grava* and Zoarab's private outburst. In *Grava*, the asylum applicant's complaints (a) were public; (b) were widely publicized; (c) targeted widespread government corruption; and (d) resulted in an official investigation and criminal charges. 205 F.3d at 1179-80. In contrast, Zoarab has not presented evidence compelling "the conclusion that [Prince Mohammad] or anyone else knew or should have know that [he] was even opposed to government corruption or had any other political opinion." *Marku*, 380 F.3d at 989. The record shows that Prince Mohammad knew that Zoarab opposed the Prince's management of Al-Wafa. Yet, in his single confrontation with the Prince, Zoarab did not raise any issue of public corruption, nepotism, lack of political rights, or anything that could reasonably be construed as political in nature. Nor was the confrontation part of a "relatively public" campaign. *Id.* at 988. Even though the U.A.E.'s restrictions on freedoms of speech and press limit a resident's ability to expose government corruption, Zoarab has been living in the United States for several years. He has offered no letters to the editor, editorials, pamphlets, internet blog entries, or any other evidence of political expression he made against the U.A.E. Simply put, Zoarab has offered no evidence that either before or after the confrontation he led a public (or even private) campaign against the government or individual members of the royalty—he just (quite understandably) wanted his money back. Any persecution resulting from the confrontation was motivated by personal business interests, not political sentiments.

For these reasons, Zoarab does not qualify as a refugee for purposes of asylum. Because being classified as a refugee is a necessary condition for asylum, we need not address the BIA's alternate ground that Zoarab does not have a well-founded fear of persecution.

## C.        Withholding of Removal and CAT

Zoarab also sought withholding of removal and relief under CAT. To be entitled to withholding of removal, the alien must demonstrate "a clear probability of persecution." *INS v. Stevic*, 467 U.S. 407, 424 (1984). This standard is stricter than that for asylum. *Yu v. Ashcroft*, 364 F.3d 700, 703 n.3 (6th Cir. 2004). As explained above, Zoarab is ineligible for asylum; therefore, he is likewise ineligible for withholding of removal.

Under CAT, the applicant must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). Zoarab did not pursue a substantive CAT claim separate from his asylum claim. On his application for asylum, Zoarab indicated that he did not fear being subjected to torture in any country to which he might be returned. Based on our review of the record, we conclude that Zoarab has failed to make out a viable claim for relief under CAT.

## III

For the reasons set forth above, we DENY Zoarab's petition for review.