RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0060p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

SANDRA SABASTIAN-ANDRES,

        *Petitioner*,

  *v.*

MERRICK B. GARLAND, Attorney General,

        *Respondent*.

No. 23-3606

───────────────

On Petition for Review from the Board of Immigration Appeals.
No. A 208 866 482

Decided and Filed:  March 20, 2024

Before: KETHLEDGE, READLER, and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ON BRIEF:**  Kevin Gardner, KBG IMMIGRATION LLC, Independence, Ohio, for Petitioner. Paul Fiorino, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

───────────────

## OPINION

───────────────

BLOOMEKATZ, Circuit Judge.  Sandra Sabastian-Andres, an indigenous Mayan Akateko woman from Guatemala now living in the United States, applied for asylum, withholding of removal, and protection under the Convention Against Torture.  The Immigration Judge denied all three claims for relief, and the Board of Immigration Appeals affirmed. The Board agreed with the Immigration Judge that Sabastian-Andres did not demonstrate a nexus between her particular social group and the harm she experienced and did not show that

the government of Guatemala acquiesced in her mistreatment there. Because the Board's conclusions were supported by substantial evidence, we deny her petition for review.

## BACKGROUND

Sandra Sabastian-Andres is a Mayan Akateko woman from Guatemala. When she was a teenager, Sabastian-Andres was approached by a man named Pedro. He told her that he wanted her to be "his woman" and demanded that she join his gang. A.R. PageID 120, 231. When she refused, Pedro started to threaten her with rape and other physical abuse. He lingered outside her house, so she stayed inside to avoid him. Her parents advised her to leave Guatemala because they worried about her safety. Sabastian-Andres felt especially concerned about Pedro's threats and "constant[] surveillance" because she and her family, who speak their indigenous language rather than Spanish, could barely communicate with the Spanish-speaking police. A.R. PageID 230. And even without the language barrier, Sabastian-Andres believed that the police collaborated with gangs, so turning to them for help would have been futile. Roughly five months after that first encounter with Pedro, Sabastian-Andres followed her parents' advice and traveled to the United States.

Sabastian-Andres arrived without inspection on April 23, 2016 and was served with a Notice to Appear the following day. In 2018, she filed an application for asylum, withholding of removal, and protection under the Convention Against Torture, arguing that she was sexually harassed and threatened by Pedro and emphasizing that she is a Mayan Akateko woman. The Immigration Judge denied all three forms of relief and ordered her removal. The IJ identified several fatal defects in Sabastian-Andres's asylum claim: Pedro's threats were not severe enough to amount to persecution; Pedro's threats had nothing to do with the fact that Sabastian-Andres is a Mayan Akateko woman; Sabastian-Andres offered no evidence showing that the Guatemalan government would be unable or unwilling to control Pedro; and Sabastian-Andres did not substantiate her claim that she could not relocate internally within Guatemala to protect herself from Pedro. Then the IJ observed that the burden of proof for withholding of removal is "more stringent" than for asylum. A.R. PageID 75. Sabastian-Andres relied on the same evidence for both asylum and withholding of removal, so because it was insufficient for asylum, it was necessarily insufficient for withholding of removal too. Finally, the IJ concluded that Sabastian-

Andres did not qualify for relief under the Convention Against Torture because she did not prove that she would likely be tortured if she returned to Guatemala. To be eligible for protection, Sabastian-Andres would have had to show that a public official had instigated, consented to, or acquiesced in Pedro's harmful conduct.

Sabastian-Andres appealed to the Board of Immigration Appeals, and the Board affirmed the IJ's decision. The Board adopted only one of the IJ's bases for denying Sabastian-Andres's asylum claim, concluding that there was no "nexus" between Pedro's threats and her identity as a Mayan Akateko woman. A.R. PageID 4. The Board did not address any of the IJ's other reasons for denying asylum. The Board agreed with the IJ that the complete lack of a nexus rendered Sabastian-Andres ineligible for withholding of removal, and it adopted the IJ's reasoning on the Convention Against Torture claim. Sabastian-Andres timely appealed.

**ANALYSIS**

## I. Standard of Review

We have jurisdiction under 8 U.S.C. § 1252 to review the Board's final determination ordering removal. *Umaña-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013). Because the Board issued its own decision instead of summarily affirming the IJ, we review the Board's decision. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). We also review the IJ's decision to the extent the Board adopted its reasoning. *Id.* We examine factual findings under the substantial evidence standard, which means that we affirm so long as the Board's finding "is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Zhao v. Holder*, 569 F.3d 238, 247 (6th Cir. 2009) (quoting *Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008)). We only reverse if "'the evidence not only supports a contrary conclusion, but *compels* it.'" *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007) (quoting *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004)). We review legal conclusions de novo. *Juan Antonio v. Barr*, 959 F.3d 778, 788 (6th Cir. 2020).

## II. Asylum

The Attorney General can exercise his discretion to grant asylum to an immigrant who meets the definition of a "refugee." *Umaña-Ramos*, 724 F.3d at 670 (citing 8 U.S.C. § 1158(b)). To qualify, the immigrant must show that they have experienced persecution or that they have a well-founded fear of future persecution "on account of" one of five protected characteristics: their race, religion, nationality, political opinion, or membership in a particular social group. 8 U.S.C § 1101(a)(42). A "particular social group" is "a group of individuals who share a common, immutable characteristic that is one that members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Marikasi v. Lynch*, 840 F.3d 281, 290 (6th Cir. 2016) (citing *Umaña-Ramos*, 724 F.3d at 671; *Kante v. Holder*, 634 F.3d 321, 327 (6th Cir. 2011)). A particular social group must also be "socially visible." *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1137 (6th Cir. 2010). And we "may not presume that persecution is on account of" an applicant's "membership in a particular social group." *Sebastian-Sebastian v. Garland*, 87 F.4th 838, 847 (6th Cir. 2023) (citation and quotation omitted).

Persecution "on account of" a protected characteristic means that the characteristic was "at least one central reason" for the persecution. 8 U.S.C. § 1158(b)(1)(B)(i). When the "central reason" requirement is met, we say that there is a "nexus" between the protected characteristic and the persecution. *Turcios-Flores v. Garland*, 67 F.4th 347, 357 (6th Cir. 2023). The protected characteristic does not have to be the only reason. *Sebastian-Sebastian*, 87 F.4th at 848; *Juan-Pedro v. Sessions*, 740 F. App'x 467, 472 (6th Cir. 2018). Even if the Board identifies one likely reason for the persecution that has nothing to do with the protected characteristic, it is still required to consider all the evidence in the record to evaluate whether a nexus exists. *See Sebastian-Sebastian*, 87 F.4th at 848. This is true even when the applicant does not explicitly testify to that nexus but provides other evidence connecting their persecution to their particular social group. *See id.* at 848–50.

Sabastian-Andres insists that Pedro targeted her because she belongs to a particular social group; she is a Mayan Akateko woman. The IJ and the Board believed that there was no nexus

between the threats and her particular social group.   Substantial evidence supports this conclusion.

The evidence that most undermines Sabastian-Andres's nexus argument is her own testimony.  Sabastian-Andres repeatedly explained that Pedro threatened her because he wanted her to be his wife and join his gang, which does not by itself foreclose the possibility of a nexus.  But at the end of her testimony, the IJ asked her to address the nexus question head-on:

IJ:      He didn't threaten you because you were a Mayan Akateko?

S-A:   I don't understand that.

IJ:      He threatened you because he wanted you to be his wife.  Correct?

S-A:   Yes.

IJ:      He didn't threaten you because you're indigenous.  He was indigenous.

S-A:   Yes.

A.R. PageID 139.  The IJ gave Sabastian-Andres the opportunity to connect the dots between her membership in a particular social group and Pedro's threats, but instead, she denied that any such connection existed.

To be clear, the fact that Pedro is also Mayan Akateko does not automatically doom Sabastian-Andres's asylum claim.  The Board has recognized a nexus even when indigeneity was a "central" part of an asylum seeker's particular social group and the alleged persecutor was indigenous too.  *Juan Antonio*, 959 F.3d at 784, 787–88.  We can imagine scenarios where a member of some disfavored group mistreats another member of that same disfavored group because of their group membership.  But the fact remains that Sabastian-Andres did not offer up any of these scenarios when asked.  Instead, she confirmed that her Mayan Akateko identity had nothing to do with Pedro's threats.

Nothing else in the record demonstrates that the Board's decision was not supported by substantial evidence.  Sabastian-Andres's application for asylum did not connect her encounters with Pedro to her indigeneity.  In her application, she described herself as Mayan Akateko, but she did not explain how her Mayan background played a role in what Pedro said and did to her.  The only conceivable connection she drew was oblique: she says that the police speak Spanish,

rather than her Mayan Akateko language, which makes it hard to report crimes. Crucially, she does not say that this encouraged Pedro to seek her out or threaten her. And because Sabastian-Andres did not testify that her inability to communicate with the police caused Pedro to target her, we cannot speculate that such a situation was at play here. *See Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008).

Sabastian-Andres also submitted letters from family members, but none of them allude to a connection between her identity as a Mayan Akateko woman and Pedro's harassment. Her father did observe that local gangs are especially likely to coerce women into joining, but he does not explain how his daughter's indigeneity might have caused Pedro to pursue her. Indeed, he does not mention his daughter's indigeneity at all. Neither do her cousins, Lety and Maria, in their letters.

Sabastian-Andres provided secondary source materials about conditions in Guatemala, but these sources do not justify reversal. The State Department's 2018 Human Rights Report on Guatemala says that indigenous communities face "pervasive discrimination," which forces them "largely outside the political, economic, social, and cultural mainstream." Bureau of Democracy, Hum. Rights & Lab., U.S. Dep't of State, *Guatemala Human Rights Report* (2018), A.R. PageID 187. But, as the IJ pointed out, the same report confirmed that Guatemalan law "provides for equal rights for indigenous persons and obliges the government to recognize, respect, and promote" indigenous groups. *Id*. at PageID 186. The academic article Sabastian-Andres submitted describes how Mayan women experience disproportionate barriers to accessing the police and the legal system, meaning that "when indigenous Maya women seek justice for the violence they endure, they are the least likely to be heard." Cecilia Menjivar & Shannon Drysdale Walsh, *Subverting Justice: Socio-Legal Determinants of Impunity for Violence against Women in Guatemala*, 5 Laws (2016), A.R. PageID 208. The same article quotes a UN Rapporteur, who described the difficult position of indigenous Guatemalan women like this: "women, particularly those of indigenous descent, [are] at risk of violence due to the compounded discrimination they face based on sex, ethnicity, and class." *Id*. at PageID 209. Even if these two pieces of evidence could support the conclusion that Sabastian-Andres's particular social group partially motivated what happened to her, Sabastian-Andres's testimony

explicitly undermines that conclusion. Therefore, we cannot conclude that the IJ and the Board lacked substantial evidence for their nexus determination.

## III. Withholding of Removal

Sabastian-Andres also applied for withholding of removal. Like asylum, withholding of removal requires a nexus between one of the five protected characteristics and the persecution. *Turcios-Flores*, 67 F.4th at 358. But it is easier to establish a nexus in the withholding context because the protected characteristic must be "at least one reason" for the mistreatment, not a central reason. *Guzman-Vazquez v. Barr*, 959 F.3d 253, 274 (6th Cir. 2020).

The IJ issued her decision before we announced the difference between the two standards, so she did not have the opportunity to consider how that difference might affect Sabastian-Andres's case. Sabastian-Andres says this amounts to reversible error. But the Board, writing four years after the IJ, applied the correct standard. Because the IJ and the Board determined that there was no nexus at all between Pedro's threats and Sabastian-Andres's particular social group, the Board concluded that she could not qualify for withholding of removal even under the more lenient nexus standard. We agree.

## IV. Convention Against Torture

Finally, Sabastian-Andres sought relief under the Convention Against Torture. To qualify, Sabastian-Andres had to prove that it was more likely than not that she would be tortured if she returned to Guatemala. The Convention Against Torture is limited to acts "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R § 1208.18(a)(1). Acquiescence can mean "willful blindness" to a private actor's abusive conduct. *Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006). If a country has made meaningful efforts to control private violence but is still struggling to gain the upper hand, we generally do not say that public officials are willfully blind to the problem. *See Zaldana Menijar v. Lynch*, 812 F.3d 491, 502 (6th Cir. 2015).

When analyzing the state action dimension of a Convention Against Torture claim, we often ask whether the applicant reported the harm they suffered to the authorities. If the applicant never contacted any officials, we usually treat this as a signal that the government did not turn a willfully blind eye to the applicant. *E.g.*, *Majano-De Hernandez v. Barr*, 777 F. App'x 810, 813 (6th Cir. 2019); *Miguel-Jose v. Garland*, 852 F. App'x 885, 890–91 (6th Cir. 2021); *Lino-Sabio v. Barr*, 805 F. App'x 385, 389 (6th Cir. 2020); *Andret v. Garland*, No. 23-3426, 2024 WL 167115 at *7 (6th Cir. Jan. 16, 2024); *Sanchez-Ochoa v. Sessions*, 690 F. App'x 317, 319 (6th Cir. 2017); *Diaz-Gonzalez v. Whitaker*, 756 F. App'x 552, 559–60 (6th Cir. 2018). After all, if an applicant "never told the government about the threats, the authorities never had a chance to acquiesce in any violence," *Majano-De Hernandez*, 777 F. App'x at 813, and "it is impossible to know how they would have responded to the call of duty," *Miguel-Jose*, 852 F. App'x at 890. Failure to inform the authorities, while important in our analysis, is not dispositive. *Cf. Juan Antonio*, 959 F.3d at 793 (approvingly citing a Board decision granting asylum to an applicant who had shown that the Moroccan government would have been unable or unwilling to control her abuser, even though she never reported him). Additional evidence in the record, including secondary sources, can help us understand what role the government played.

Sabastian-Andres did not report Pedro's threats to the police. In her application and during her testimony, she said she could not communicate with the Spanish-speaking police and that the police collaborate with gangs anyway. Her father explained in his letter that the police do not investigate reports of gang violence.

The secondary sources she provided support different conclusions on the willful blindness question. On the one hand, they tell a bleak story about the Guatemalan government's capacity and willingness to curb gang violence. For example, the State Department's country report observes that "[p]olice had minimal training or capacity to investigate sexual crimes or assist survivors of such crimes, and the government did not enforce the law effectively." Bureau of Democracy, Hum. Rights & Lab., U.S. Dep't of State, A.R. PageID 182. Another expert confirmed that "[w]hen contacted, police either do not respond or fail to engage in meaningful criminal investigations" such that victims are frequently "re-victimized by police if they report a

crime." A.R. PageID 199. But Guatemala has taken some steps to address the problem, even if they haven't been very effective. And the IJ pointed out that the authorities must be making *some* effort to respond to gang violence because gang members do go to prison in Guatemala. The IJ also noted that Sabastian-Andres and her family feared that Pedro would retaliate against them if she went to the police, which suggests that he believed there would be consequences for him if the police found out about his harassment.

There are effectively two narratives about state action that emerge from all this evidence. But our task is not to pick the version that we believe is more convincing. Instead, we evaluate whether the version articulated by the Board and the IJ was supported by reasonable, substantial, and probative evidence. Here, it was.

**CONCLUSION**

For these reasons, we deny Sabastian-Andres's petition for review.