NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0374n.06

Case No. 25-3001

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 28, 2025
KELLY L. STEPHENS, Clerk

JACINTO SALOMON COBO-LOPEZ )
)
    Petitioner, )
)
                      )    ON PETITION FOR REVIEW FROM
v.                         )    THE UNITED STATES BOARD OF
                      )    IMMIGRATION APPEALS
PAMELA BONDI, Attorney General, )
)
    Respondent.                  )                     OPINION
)

Before: COLE, GIBBONS, and BUSH, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Jacinto Cobo-Lopez petitions for review of an order of the Bureau of Immigration Appeals affirming an immigration judge's finding that he was eligible for removal. We deny the petition.

I.

Jacinto Salomon Cobo-Lopez is 27 years old and grew up in a rural hamlet near Santa Maria Nebaj in Guatemala; he speaks both Spanish and Ixil, a Mayan language.[1] In December 2015, Cobo-Lopez came to the United States, fleeing members of a gang, named Mara Salvatrucha, who sought to recruit him. He first encountered these gang members in the town square in December 2014, while he was on his way to school. The gang members threatened him into joining the gang, which Cobo-Lopez ultimately did. During the months Cobo-Lopez spent with the gang, he saw them hit and rob people, and he also heard that they had killed people. Cobo-

---

[1] We cite Cobo-Lopez's hearing testimony, as he was found credible by the immigration judge.

Lopez did not tell his parents at the time that he was in the gang. But when the gang pressured him toward joining them in further violence, including potential murders, Cobo-Lopez told his parents, left the gang on November 12, 2015, and fled to the United States.

Cobo-Lopez fears that if he returns to Guatemala, the gang will find and kill him. While he was a member, they threatened and mistreated him, hitting him in the head with a thrown bottle and hitting his stomach when he refused to do what they asked. After he left the gang but before he left the country, gang members called or visited his home every day to pressure him into rejoining. When he refused, they threatened to kill him and his mother. Cobo-Lopez's mother twice called the police, but they did not come. The gang stopped contacting Cobo-Lopez once he reached the United States.

Cobo-Lopez arrived in the United States at Rio Grande City in Texas on December 10, 2015. The next day, December 11, 2015, he was given a Notice to Appear (NTA) for removal proceedings, which charged that he was removable under 8 U.S.C. § 1182(a)(6)(A)(i). The NTA was defective, as it did not include the time and date of his removal hearing. Cobo-Lopez first appeared before the immigration judge (IJ) more than a year later, on January 4, 2017. He admitted the allegations of the NTA and conceded removability at that time. Cobo-Lopez had two more brief hearings before the IJ, on July 19, 2017, and February 14, 2018, and then a final merits hearing on January 8, 2021. Cobo-Lopez presented evidence, including a Guatemala human rights report from the Department of State and a translated statement from his parents in Guatemala.

At that January 8 hearing, the IJ heard testimony from Cobo-Lopez and found in an oral decision issued that day that he was removable. The IJ determined that Cobo-Lopez was credible, but that he was not eligible for asylum or withholding of removal because he had not experienced persecution based on any of the protected grounds. Cobo-Lopez then appealed to the Bureau of

Immigration Appeals (BIA), which affirmed the IJ and issued a decision dismissing his appeal on December 5, 2024. Cobo-Lopez filed a timely petition for review of the BIA's removal order, which we have jurisdiction to review. *See* 8 U.S.C. § 1252(a)(1).

## II.

Where the BIA reviews an IJ's decision de novo and issues its own opinion, we review the BIA's decision. *Guzman-Vazquez v. Barr*, 959 F.3d 253, 259 (6th Cir. 2020). We also review the IJ's decision to the extent the BIA adopted its reasoning. *Id.* In this case, the BIA issued its own opinion but adopted the IJ's reasoning in some places. Where this occurs, we review the IJ's decision and reasoning.

For both the BIA and IJ decisions, we consider factual findings under the substantial evidence standard, under which "we affirm so long as the Board's finding 'is supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Sabastian-Andres v. Garland*, 96 F.4th 923, 929 (6th Cir. 2024) (quoting *Zhao v. Holder*, 569 F.3d 238, 247 (6th Cir. 2009)). And we will "reverse only if 'the evidence not only supports a contrary conclusion, but *compels* it.'" *Id.* (quoting *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007)). We review legal conclusions de novo. *Id.*

## III.

Cobo-Lopez raises seven issues on appeal, some of which overlap. We proceed through each, in the order in which he advances them.

## A.

We begin with Cobo-Lopez's argument regarding his defective NTA. Federal law establishes requirements for NTAs in removal proceedings. 8 U.S.C. § 1229(a)(1). Among them, the NTA must contain "[t]he time and place at which the proceedings will be held."

8 U.S.C. § 1229(a)(1)(G)(i). As previously noted, Cobo-Lopez's December 11, 2015, NTA did not have this statutorily required information—instead, it just provided that the time and place of his hearing were to be set later. The Supreme Court has held that such an NTA is not the statutorily required notice to appear. *Pereira v. Sessions*, 585 U.S. 198, 208–09 (2018) ("A putative notice to appear that fails to designate the specific time or place of the noncitizen's removal proceedings is not a 'notice to appear under section 1229(a)[.]'"); *see also Niz-Chavez v. Garland*, 595 U.S. 155, 159–60 (2021).[2]

Cobo-Lopez did not raise the argument that his NTA was defective until appeal before the BIA. The Board admitted that the NTA was defective, but pointed to its decision in *Matter of Fernandes*, 28 I & N Dec. 605 (BIA 2022), in which it categorized the requirement as a "claims-processing rule" rather than a provision affecting the jurisdiction of the immigration judge. DE 8-2, BIA Op., CAR 3 (quoting *Fernandes*, 28 I & N Dec. at 608). The distinction matters because, "[u]nlike jurisdictional limits . . . claim-processing rules are subject to waiver and forfeiture by a litigant." *McIntosh v. United States*, 601 U.S. 330, 337 (2024). In *Fernandes*, the BIA stated that it would "generally consider an objection to a noncompliant notice to appear to be timely if it is raised prior to the closing of pleadings before the Immigration Judge." *Fernandes*, 28 I & N Dec. at 610–11.

---

[2] *Pereira* addressed the "stop-time rule" associated with the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009-546, under which (1) noncitizens can apply for adjustment of immigration status, under certain circumstances, after ten years of presence in the United States, but (2) the service of an NTA stops the accrual of this ten-year period. 585 U.S. at 202–03. Its analysis laid the groundwork for *Niz-Chavez*, which in turn further interpreted the requirements for an NTA. 593 U.S. at 159. Because *Pereira* and *Niz-Chavez* addressed only the stop-time rule, which is not at issue here, they do not squarely address whether Cobo-Lopez's argument is timely or, if not timely, excusable.

This court has applied the rule of *Fernandes* in a series of unpublished decisions, holding that a challenge to a defective NTA was untimely, and thus properly not considered, if not raised during proceedings before the IJ. *See, e.g.*, *Alvarenga-Canales v. Garland*, No. 22-3514, 2023 WL 3094545, at *3 (6th Cir. Apr. 26, 2023) (neither raised before IJ nor BIA); *Reyes-Rodriguez v. Garland*, No. 23-3548, 2024 WL 1574673, at *4 (6th Cir. Apr. 11, 2024) (not raised until motion to reopen proceedings made with BIA); *Palma-Campos v. Bondi*, No. 24-3490, 2025 WL 665849, at *1 (6th Cir. Feb. 20, 2025) (same); *Hernandez v. Bondi*, No. 24-3467, 24-3468, 24-3469, 24-3470, 24-3472, & 24-3474, 2025 WL 943710, at *1 (6th Cir. Mar. 28, 2025) (same). We follow those cases today.

Cobo-Lopez argues that his argument should be considered timely because his hearing on the merits occurred before the 2022 decision in *Fernandes*. The government admits his last hearing before the IJ was January 8, 2021. But this is not a reason why he could not have raised his objection before then, as it was based not just on *Niz-Chaves* and *Fernandes* but also on the Supreme Court's earlier decision in *Pereira*.

Regarding our consideration of the timeliness of his objection, Cobo-Lopez urges us to adopt the approach of the Seventh Circuit. In that circuit, "relief" is "available for those who make timely objections," and also for "those whose timing is excusable and who can show prejudice." *Ortiz-Santiago v. Barr*, 924 F.3d 956, 965 (7th Cir. 2019). As we pointed out earlier this year in *Espinoza-Anguiano v. McHenry*, however, the Seventh Circuit itself has foreclosed this argument. No. 24-3219, 2025 WL 405108, at *2 (6th Cir. Feb. 5, 2025) (citing *Meraz-Saucedo v. Rosen*, 986 F.3d 676, 683 (7th Cir. 2021)). Although we do not disclaim the Seventh Circuit's approach, Cobo-Lopez's timeliness argument would fail even if it applied here. Cobo-Lopez is thus not entitled to relief on these grounds.

B.

We next consider Cobo-Lopez's argument that the IJ failed to carry out a sufficiently distinct analysis of Cobo-Lopez's claim for withholding of removal. This issue is intertwined with the IJ's and BIA's decisions about Cobo-Lopez's asserted social group, which was relevant to the asylum determination.

Immigration law provides that noncitizens in the United States may be granted asylum by the Secretary of Homeland Security or the Attorney General if they are determined to be a "refugee," which is defined, in pertinent part, as someone outside their home country who is "unable or unwilling" to return to that country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42)(A). Cobo-Lopez claimed asylum on the grounds that he had suffered persecution as a member of a distinct social group, namely young ethnic Mayans, who were former gang members, residing in the remote rural areas of Guatemala, who have refused to join the gang despite having been targeted and approached by gang members demanding that they join. DE 8-2, IJ Hearings, CAR 103–04.

There is another ground under which a noncitizen can challenge removability: they can seek "withholding of removal." The Attorney General must withhold removal if "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The standards for asylum and withholding of removal are very similar, and an application for asylum is also deemed an application for withholding of removal. 8 C.F.R. § 1208.3(b).

Cobo-Lopez argues that neither the IJ nor the BIA analyzed his withholding of removal claim with sufficient particularity, given that it is governed by a different standard. He is right, at

least in one regard. We have held that, based on statutory language, a noncitizen can seek withholding of removal if that protected ground was merely "at least one reason" for past persecution. *Guzman-Vazquez*, 959 F.3d at 274. This is distinct from the standard for asylum, which requires more: that the applicant establish that one of the protected grounds is "at least one central reason for persecuting" them. *Id.* at 270 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). The difference does not make "causation for withholding claims easier to prove than causation for asylum claims," because an applicant for withholding still has a higher burden to show the probability of future persecution. *Id.* at 274 (alteration omitted). But it is distinct. It could conceivably have been necessary to carry out separate analysis under this prong.

The problem for Cobo-Lopez, however, is that this distinction does not affect his case. The BIA held that Cobo-Lopez's testimony did not establish persecution, for asylum purposes, because his asserted social group was not cognizable. In other words, despite his credible testimony of mistreatment, Cobo-Lopez did not experience persecution in connection with any protected ground. Because both asylum and withholding of removal require affiliation with a protected group or status, if Cobo-Lopez failed to qualify for asylum on this ground, then he also failed to qualify for withholding of removal. So this raises the question of whether the BIA was correct to hold that Cobo-Lopez's social group was not cognizable.

Whether his social group is cognizable is a purely legal question, and as such we review it de novo. *Reyes Galeana v. Garland*, 94 F.4th 555, 558 (6th Cir. 2024). An applicant for asylum or for withholding of removal based on a claim of persecution in connection with membership in a particular social group, must show that he belongs to a group that is (1) "comprised of members who share an immutable characteristic"; (2) "defined with particularity"; and (3) "perceived to be socially distinct in the society in question." *Id.* at 558–59. We note that "this court has already

rejected the claim that individuals targeted to join MS-13 qualify as a socially distinct group." *Cruz-Guzman v. Barr*, 920 F.3d 1033, 1036 (6th Cir. 2019) (citing *Umana-Ramos v. Holder*, 724 F.3d 667, 674 (6th Cir. 2013)).

Cobo-Lopez's asserted group is different; it is based on past gang membership and also on young rural Guatemalan status. He defines it as: "Young ethnic Mayans residing in the remote rural areas of Guatemala who have been targeted and approached by gang members demanding that they join the gang but who have refused." DE 8-2, Proposed Stipulated Facts, CAR 153. At a hearing, his attorney added the criterion that the young men be "former gang members." *Id.* at CAR 104. On appeal, Cobo-Lopez points out that Mayan race is an immutable characteristic and that although residence in rural communities might not intuitively be seen as immutable, it should be. But his only argument for the second and third prongs is that this group's very "specific and distinguishable" characteristics "mak[e] it distinct from the rest of society." CA6 R. 15-1, Pet. Br., at 17.

Our cases require more than this, especially in the gang context. *See Cruz-Guzman*, 920 F.3d at 10236–37; *Umana-Ramos*, 724 F.3d at 673–74. We have held, in a case involving claimed persecution against Mexican business owners, that the "social distinction" prong "demands a showing that Mexican society actually perceives the purported group to be a distinct class of persons subject to persecution." *Reyes Galeana*, 94 F.4th at 559. Cobo-Lopez's claims here are like those we rejected in *Zaldana Menijar v. Lynch*, 812 F.3d 491, 498–499 (6th Cir. 2015). In that case, the petitioner sought to establish that he belonged to a persecuted group of "active and long-term former gang members," and we held that his evidence did not "support the crucial requirement that *society*, not the gangs themselves, perceives former members as a socially distinct group." *Id.* at 499. It is not true that former gang membership could never be the kind of distinct

social group membership that can support a persecution claim. *See id.* But such a claim requires evidentiary support and investigation into the individual facts and circumstances of the case. And for such a claim to be successful, more evidence is required than was presented here. It is Cobo-Lopez's burden to establish all the prongs of a cognizable group, and as to social distinction, he does not offer sufficient evidence for the group he claims.

The social distinction prong is not a recasting of the particularity and immutability prongs; it is an independent requirement. Because Cobo-Lopez has not made this showing, and thus has not established that he belongs to a cognizable particular social group for persecution purposes, his withholding claim fails, and it was not necessary for the IJ or the BIA to analyze grounds for persecution under a different standard.[3]

Cobo-Lopez also argues that the BIA "erroneously disregarded the severe harm" to which he testified, refusing to say whether it rose to the level of persecution. CA6 R. 15-1, Pet. Br., at 19. But the persecution inquiry "takes place only after" the applicant establishes protected status under the asylum or withholding of removal statutes. *Reyes Galeana*, 94 F.4th at 560. Our conclusion that Cobo-Lopez has not established that he belongs to a cognizable particular social group means that this argument also necessarily fails.

C.

Cobo-Lopez also contends that the BIA "erroneously concluded Mr. Cobo-Lopez could reasonably relocate within his country." CA6 R. 15-1, Pet. Br. at 19. As Cobo-Lopez points out, the BIA did not independently analyze this issue. It adopted the IJ's decision, so we analyze that. *See Guzman-Vazquez*, 959 F.3d at 259.

---

[3] We base our conclusion only on this prong of the cognizable group analysis and do not decide whether, as the BIA found and the government asks us to find, this asserted protected group was impermissibly circularly defined by its harm.

"In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate." 8 C.F.R. § 1208.13(b)(3)(i). This language applies here, because Cobo-Lopez has not established that he belongs to a cognizable particular social group. In analyzing the potential of relocation, the regulations provide that "adjudicators should consider the totality of the relevant circumstances regarding an applicant's prospects for relocation." *Id.* § 1208.13(b)(3).

Here, the IJ did so. He found that it would be "reasonable for [Cobo-Lopez] to relocate to another part of the country." DE 8-2, IJ Op., CAR 53. The IJ provided four reasons. First, although Cobo-Lopez primarily speaks Ixil, he was able to overcome a language barrier to find a job and housing in the United States. Second, "no records or evidence" supported Cobo-Lopez's asserted fear that if he moved to another village, locals would "think he was a thief and possibly harm him." *Id.* Third, "there is no civil strife, inadequate civil infrastructure, or geographical limitations" that would prevent internal relocation generally. *Id.* And the IJ saw "no reason to believe that gang members across the country would have a way of identifying him or recognizing him based on his limited interactions with the gang in his local town." *Id.*

Even if not comprehensive, this analysis by the IJ, and its subsequent adoption by the BIA, belies Cobo-Lopez's argument on appeal that the Board did not sufficiently evaluate country conditions related to his relocation claim. Additionally, we are not persuaded by Cobo-Lopez's argument on this appeal that relocation is unreasonable because "[t]here is no place in Guatemala where he could live safely." CA6 R.15-1, Pet. Br., at 16. While we do not doubt that he may face risks from the gang if he returned to his hometown, he offers limited evidence to support his argument that he would face similar risks elsewhere in Guatemala—and insufficient evidence to

"compel" us to reach a conclusion contrary to the BIA's. *Sabastian-Andres*, 96 F.4th at 929 (emphasis omitted).

D.

Next, Cobo-Lopez argues that the BIA erred in denying relief under the Convention Against Torture (CAT), which bars removal in certain circumstances. Under the regulations implementing the CAT, the applicant for relief must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). Qualifying torture must be "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). And "[a]cquiescence can mean 'willful blindness' to a private actor's abusive conduct." *Sabastian-Andres*, 96 F.4th at 931 (quoting *Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006)). The likelihood may be established by the applicant's own, uncorroborated testimony, if credible. 8 C.F.R. § 1208.16(c)(2). We review the factual determinations connected to a CAT decision under the substantial evidence standard, but legal questions de novo. *Marqus v. Barr*, 968 F.3d 583, 588–89 (6th Cir. 2020).

Cobo-Lopez first argues that the BIA and IJ did not give sufficiently meaningful consideration to his arguments. CA6 R. 15-1, Pet. Br., at 21–22. We disagree, although the question is close. The IJ's and BIA's cursory analysis here comes close to critical deficiency. "Though it need not write an exegesis on every contention, the BIA must consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Trujillo Diaz v. Sessions*, 880 F.3d 244, 255 (6th Cir. 2018) (internal quotations omitted). In the eyes of the IJ, Cobo-Lopez failed to establish that he would likely be tortured if he was removed to Guatemala because his mother, "who remained in

Guatemala and was a subject to the gang's threats, was never harmed." DE 8-2, IJ Op., CAR 55. The BIA, in turn, agreed with the IJ: "The record evidence does not support the conclusion that it is more likely than not that the Guatemalan government would torture the respondent, acquiesce, or be willfully blind to his torture upon returning to Guatemala as required for protection under the CAT." DE 8-2, BIA Op., CAR 4.

This court has, in previous cases, vacated and remanded the BIA's decision for more searching review of relevant torture-related information in the record, for instance where the Board had failed completely to mention instances of torture in country conditions reports. *See, e.g.*, *Mostafa v. Ashcroft*, 395 F.3d 622, 625–66 (6th Cir. 2005). But the IJ's determination here that Cobo-Lopez had not met the standard was based on "consid[eration of] all the documentary evidence submitted," which included a 2018 Human Rights Report for Guatemala. CAR 8-2, IJ Op., CAR 55; *Id.*, Guatemala Human Rights Report, CAR 172. Unlike *Mostafa*, where the BIA failed to recognize a record of "extensive human rights abuses," including evidence of widespread torture, the record here does not suggest obvious oversight of similarly significant and serious country conditions. *Mostafa*, 395 F.3d at 625–26. Although the submitted human rights report notes the risk of torture in mental health and prison facilities, and weak reporting mechanisms, unlike those considered in *Mostafa* the materials in this case do not persuade us that if the BIA had "properly considered all evidence relevant to the possibility of future torture in [Guatemala], it might have adjudicated [Cobo-Lopez's] claim differently." *Id.* at 626.

This conclusion is bolstered by the IJ and BIA's assessment of the specific threats facing Cobo-Lopez. The IJ rejected Cobo-Lopez's CAT claim, in part, because his mother, one of the subjects of the gang's threats, was never harmed despite remaining in the same village. CAR 8-2, IJ Op., CAR 55. While that analysis alone would be insufficient, as it did not address

the risks that Cobo-Lopez himself faced as a former member of the gang, the IJ clarified that its fuller threat analysis was "noted above." *Id.* And earlier in the decision, the IJ more fully explained that Cobo-Lopez failed to show "that he would be harmed [upon] returning" because he "had been gone from Guatemala for years" and the gang "never followed through" on "analogous" threats made to his mother. *Id.* at 54. Additionally, the IJ noted that "despite remaining in Guatemala after quitting the gang, [Cobo-Lopez] was not harmed while in Guatemala" and "only received threats and saw gang members walking by his house." *Id.* Consequently, the IJ's reasoning was not so lacking as to require remand for further analysis.

Second, Cobo-Lopez also argues that the BIA failed to review the evidence "on its merits" and instead "dismissed[ed] it as speculative." CA6 R. 15-1, Pet. Br., at 22. But, even if its explanation was sparse and overly reliant on the IJ's reasoning, the BIA clarified that it had in fact reviewed the "record evidence." DE 8-2, BIA Op., CAR 4.

Cobo-Lopez still has the underlying burden of establishing that that it is more likely than not that he would be tortured with at least the government's "acquiescence" or "willful blindness" if removed to Guatemala. *Sabastian-Andres*, 96 F.4th at 931; *see* 8 C.F.R. § 1208.16(c)(2). And we agree that Cobo-Lopez's evidence did not give rise to a sufficient probability that he would be tortured upon return to Guatemala with at least the willful blindness of the government.

Cobo-Lopez offered several pieces of evidence to support his argument. He testified credibly that the gang hit him in the head with a glass bottle. *See* DE 8-2, Hearing, CAR 134; DE 8-2, IJ Op., CAR 51. The IJ found that this was the "only harm he suffered from the gang." *Id.* This was incorrect, because Cobo-Lopez also testified to being hit in the stomach. *Compare* DE 8-2, Hearing, CAR 135, *with* DE 8-2, IJ Op., CAR 51. Cobo-Lopez also testified that during the month after he left, gang members called his mother and said that they would kill both him and

her. Although his mother did not mention it in her statement, Cobo-Lopez testified that she twice called the police to report the gang's threats, and they did not respond. Once, after he had left, the gang came to his house, but they did not enter, as the gate was locked. Finally, he testified that he believes the gang would come looking for him if he returned to Guatemala, though he admits they have had no contact with him or his mother (who remains unharmed in Guatemala) in over five years.

Considering conditions in Guatemala specifically, we have noted that the police are not likely to respond to gang-related violence, but also that Guatemala "has taken some steps to address the problem." *Sabastian-Andres*, 96 F.4th at 932. Additionally, the IJ found most convincing the fact that the gang never carried out its "analogous" threats against Cobo-Lopez's mother and eventually stopped contacting her. DE 8-2, IJ Op., CAR 54–55. The Board agreed with the IJ, and further reasoned that CAT eligibility "cannot be established by stringing together a series of suppositions to show that it is more likely than not that torture will result if the evidence does not establish that each step in the hypothetical chain of events is more likely than not to happen." DE 8-2, BIA Op., CAR 4 (citing *Matter of J-F-F-*, 23 I&N. Dec. 912, 917–18 (A.G. 2006)). We agree with this analysis. The gang harmed Cobo-Lopez, and was certainly intimidating and threatening him and his family, but it has neither contacted him nor acted against his family since he fled. Cobo-Lopez has not presented sufficient evidence to meet the standard for relief under the CAT.

E.

Cobo-Lopez finally argues that the BIA erred in denying his request for voluntary departure and abused its discretion. After removal proceedings have concluded, the Attorney General "may permit an alien voluntarily to depart the United States at the alien's own expense" in certain circumstances. 8 U.S.C. § 1229c(b)(1). A noncitizen qualifies for this relief if he satisfies four

eligibility requirements: (1) he has been physically present in the United States for one year preceding service of the NTA; (2) he has been of good moral character for 5 years preceding his application for voluntary departure; (3) he is not deportable under certain other statutory provisions, and (4) he has established "by clear and convincing evidence" that he has the means to depart the United States and intends to do so. *Id.* The BIA found that Cobo-Lopez had not presented evidence supporting prima facie eligibility for voluntary departure. In particular, Cobo-Lopez failed to present evidence of a passport or other travel document that would permit him to leave the country.

As an initial matter, we note that although § 1229(c)(b)(1)'s overarching "may permit" language is discretionary, we retain jurisdiction to decide nondiscretionary legal questions within that determination. *See Hernandez v. Garland*, 59 F.4th 762, 768–70 (6th Cir. 2023). Just as in *Hernandez*, we are analyzing one of multiple eligibility requirements *within* a discretionary decision; here, it is the BIA's determination that Cobo-Lopez had not met the requirement to demonstrate the means and intent of departing the United States voluntarily. 8 U.S.C. § 1229c(b)(1)(D); *see* DE 8-2, BIA Op., CAR 4. We have jurisdiction to review the Board's decision on this ground. *Hernandez*, 59 F.4th at 770.

And just as in *Hernandez*, we would affirm here on any standard of review. *See id.* at 771. On appeal, Cobo-Lopez claims that he has a passport that he is ready to submit to the BIA. But the government points out that he has still "submitted no evidence" of this passport, and that statements by his counsel are not themselves sufficient evidence. CA6 R. 16, Resp. Br., at 40–41 (citing *I.N.S. v. Phinpathya*, 464 U.S. 183, 188 n.6 (1984)). We agree with the government. Cobo-Lopez has still not demonstrated his eligibility for voluntary departure, and the BIA did not err in determining that he was not eligible for this relief on this ground.

IV.

We deny Cobo-Lopez's petition for permission to appeal the BIA's decision affirming the IJ's decision that he is eligible for removal to Guatemala.